1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

BRIAN RICK DELAMARTER, M.D.,
individually and as Trustee of the Delamarter
Family Trust U/T/D/ 6/11/93, an individual,
DEL-BLB LLC, a California limited liability
company,

                        Plaintiffs,

      v.

HAROLD G. DELAMARTER, an individual,
GREGORY J. VISLOCKY, an individual, and
DOES 1 through 10,

                     Defendants,

                    and

PRESTIGE CARE, INC., a Washington
Corporation, PRESTIGE SENIOR LIVING,
LLC, an Oregon limited liability company,

               Nominal Defendants.

**CASE NO. 3:21-cv-5939**

**COMPLAINT FOR:**

1) **Breach of Fiduciary Duty (On
   Behalf of Prestige Care, Inc. against
   Defendants)**

2) **Breach of Fiduciary Duty (On
   behalf of Dr. Rick as Trustee of the
   Delamarter Family Trust U/T/D
   6/11/93 and DEL-BLB LLC against
   Defendants in Their Capacities with
   PCI)**

3) **Breach of Written Contract (On
   behalf of Prestige Care, Inc. against
   Defendants)**

4) **Breach of Fiduciary Duty (On
   behalf of Prestige Senior Living,
   LLC against Defendants)**

5) **Breach of Fiduciary Duty (On
   Behalf of Dr. Rick as Trustee of the
   Delamarter Family Trust U/T/D
   6/11/93 and DEL-BLB LLC against
   Defendants in Their Capacities with
   PSL)**

COMPLAINT (No. _____) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

6)  **Breach of Fiduciary Duty (on behalf of Dr. Rick individually against Defendants, individually as partners of D.D.&F.)**

7)  **Accounting (on behalf of Prestige Care, Inc.)**

8)  **Accounting (on behalf of Prestige Senior Living, LLC)**

9)  **Declaratory Relief (on behalf of Prestige Care, Inc.)**

10) **Injunctive Relief (on behalf of Prestige Care, Inc.)**

11) **Injunctive Relief (on behalf of Prestige Senior Living, LLC)**

12) **Appointment of Receiver (on behalf of Prestige Care, Inc.)**

13) **Appointment of Receiver (on behalf of Prestige Senior Living, LLC)**

14) **Judicial Dissolution (of Prestige Care, Inc. [RCW § 23.B.14.300])**

15) **Judicial Dissolution of (Prestige Senior Living, LLC [ORS § 63.661(b)])**

**DEMAND FOR JURY TRIAL**

Plaintiffs, Brian Rick Delamarter, M.D., individually and in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB LLC, a California limited liability company (collectively, "Plaintiffs") bring this action against Defendants Harold G. Delamarter and Gregory J. Vislocky, (collectively "Defendants"), and Nominal Defendants Prestige Care, Inc. and Prestige Senior Living, LLC ("Nominal Defendants") and allege the following:

COMPLAINT (No. _____) – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## INTRODUCTION

1.      Prestige Care, Inc. ("PCI") and Prestige Senior Living, LLC ("PSL," collectively referred to with PCI as "Prestige" or the "Company") together operate a portfolio of over seventy (70) independent living and assisted living facilities and rehabilitation, post-acute care, and memory care centers across Alaska, Arizona, California, Idaho, Montana, Oregon, Nevada, and Washington.[1] Prestige is one of the leading providers of senior care services on the west coast of the United States.[2]

2.      What began as a small enterprise founded by a female entrepreneur in 1946 has evolved into a large-scale enterprise generating hundreds of millions of dollars each year.

3.      Regrettably, despite its substantial footprint in the senior care industry, Prestige has failed to operate in a manner consistent with its past success and with the reasonable expectations of its stakeholders.[3]

4.      Prestige's corporate governance has been broken and completely disregarded by two individuals, Defendants Harold G. Delamarter and Gregory J. Vislocky ("Defendants"), who control the majority of PCI's Board, Prestige's ownership interests and who serve as the two most senior executives of Prestige.

5.      While the COVID-19 pandemic ravaged the country and inflicted tragic losses on Prestige's clientele in particular[4], Defendants intentionally hid information from and mislead

---

[1] PCI operates the post-acute care and memory care centers, while PSL operates the independent living and assisted living facilities.

[2] https://www.prestigecare.com/about-prestige (last accessed November 19, 2021).

[3] The term "stakeholders," is used to refer to both the shareholders of the common stock of PCI, in addition to the members of PSL. As explained herein, the shareholders of PCI and membership interests of PSL are identical along with their respective ownership percentages in each entity. Accordingly, they are often referred to throughout this Complaint as simply "Prestige".

[4] Numerous news media outlets and government agencies have reported on the disproportionate

COMPLAINT (No. _____) – 3

PCI's Chairman of the Board (and third Director of the Board) in order to pass through millions of dollars in exorbitant salary increases and bonuses to an "executive committee"[5] team of six persons[6] (hereinafter the "Management Team"), without ever calling a duly noticed Board of Director (as to PCI) or Member (as to PSL) meeting or securing the written consent of all PCI's Directors. Of note, two of the members of the Management Team include Defendant Harold Delamarter's own children.

6.      Defendants' actions violated PCI's Articles of Incorporation and Bylaws which together vest exclusive power in the Board of Directors to make substantive decisions concerning the management of PCI's business and to set the compensation of the Company's executives and officers. Defendants were aware of this fact, having been specifically reminded of their responsibilities as members of the Board of Directors by the Chairman of the Board in the fall of 2020 and by the Company's own lawyers in November 2020.

7.      Defendants' seven-figure *ultra vires* handouts could not have come at a worse time. Prior to the COVID-19 pandemic, Prestige had been consistently losing money and had to be artificially propped up with an approximately twenty-five million dollar ($25 million) cash infusion from Dr. Rick and Defendants between approximately 2016 and 2019. The COVID-19 pandemic only exacerbated the financial woes of Prestige, forcing Prestige to defer tax payments, critical investments, and repairs to its facilities, in addition to taking on tens of millions of dollars in government debt to continue to stabilize the Company. Notably, Prestige

---

amount of COVID-19 related deaths occurring in the senior citizen population and at senior care facilities in particular.

[5] The term "executive committee," as Defendants have previously used it is a misnomer. While Prestige's Bylaws authorize the formation of subcommittees, the members of the subcommittee must be members of the Board of Directors. None of the members of the purported "executive committee" are members of Prestige's Board of Directors. *See* Bylaws, Ex. 3, § 2.13.

[6] The current Management Team now has seven persons.

COMPLAINT (No. _____) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

had yet to pay back its debts to the IRS and the federal government at the time the illicit bonuses and salary increases were implemented. Moreover, given the state of the COVID-19 pandemic, the Company should have been investing resources to ensure the protection of its vulnerable clientele, not lining the pockets of its executives.

8.      Nowhere is this more evident than Prestige's ongoing need for additional working capital to keep the facilities it operates afloat. Remarkably, Defendants, over Dr. Rick's objections, have resorted to encumbering the assets of a general partnership known as D.D.&F., in which Dr. Rick owns the largest partnership interest, in order to personally guaranty the debts of several of Prestige's subsidiaries *without any consideration*.

9.      Defendants' disregard of Prestige's governing documents, basic rules of corporate law, and the financial circumstances of Prestige is unfortunately reflective of a culture of mismanagement at the Company. For example, in or around 2017, the Equal Employment Opportunity Commission (EEOC) brought a lawsuit against Prestige and their affiliates alleging the companies required employees to "perform 100% of job duties without restriction, accommodation, or engaging in the interactive process," in addition to "discharg[ing] employees with disability pursuant to inflexible leave policies." In February 2020, Prestige and their affiliates settled the lawsuit with the EEOC by agreeing to a $2 million settlement.[7] Prestige is also currently the subject of a Department of Justice investigation, the full extent of which has not been disclosed to, discussed with, or shared with the PCI's Chairman of the Board and all of Prestige's shareholders.

10.      Prestige has also been involved in a host of other litigations over the years alleging negligent management of its care facilities. These lawsuits have exposed the Company to unacceptable civil liabilities and attorney's fees and costs. Its corporate records also contain

---

[7] https://www.eeoc.gov/newsroom/prestige-care-and-prestige-senior-living-pay-2-million-settle-eeoc-disability (last accessed November 19, 2021).

COMPLAINT (No. _____) – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

1    notices of civil penalties and default orders against its various care facilities.

2        11.    After the Chairman of PCI's Board and also the representative of Prestige's

3    largest shareholding bloc[8], Plaintiff Brian Rick Delamarter, M.D. ("Dr. Rick," also referred to as

4    the "Chairman"), learned of Defendants' *ultra vires* acts in 2020 and again in 2021, Dr. Rick

5    urged Defendants to remedy their conduct and to conform their conduct to Prestige's governing

6    documents. Dr. Rick pleaded with Defendants to honor Prestige's Bylaws and to share

7    information with him so that he could perform his functions as Chairman. Dr. Rick also

8    demanded Defendants refrain from doling out exorbitant bonuses and pay raises to the *highest*

9    *paid employees* at the Company (besides themselves), *at least* until, among other things, the

10   Company's finances stabilized from the COVID-19 pandemic, deferred taxes were paid, the

11   Company's large government loans were forgiven or paid back, and the Company caught up on

12   its long overdue capital expenditures.

13       12.    Unfortunately, the reasonable requests of the Chairman and the largest stake

14   holding bloc have fallen on deaf ears, necessitating the instant litigation. Unless immediate

15   action is taken to compel the Company's management to change its current course, Dr. Rick

16   fears Prestige's patients, employees, and stakeholders will be irreparably harmed by the

17   irresponsible actions of the Company's current management.

18                              **JURISDICTION AND VENUE**

19       13.    The Court has subject matter jurisdiction based upon diversity of citizenship, 28

20   U.S.C. § 1332. The amount in controversy exceeds $75,000.00, exclusive of interests and costs,

21   and the case is between citizens of different states.

22       14.    Dr. Rick resides in and is domiciled in the State of California and is a citizen of

23
24   [8] As set forth in the Complaint caption and in more detail below, Dr. Rick is the trustee of the
     Delamarter Family Trust U/T/D 6/11/93, which owns 27.78% of the common stock of PCI of the
25   member ship interests of PSL, and manager of DEL-BLB LLC, which owns 13.89% of the
     common stock of PCI and membership interests of PSL. Defendants own the remaining 58.33%
26   of the common stock of PCI and of the membership interests of PSL.

COMPLAINT (No. _____) – 6

the State of the California. Dr. Rick is a Board-certified orthopedic surgeon who enjoyed a decades long career as a pioneer and world leader in artificial disc replacements, motion preservation technology, non-fusion technologies, and minimally invasive spine surgery. Prior to his retirement in 2017, Dr. Rick served as the Vice Chair for Spine Services at the Department of Surgery and as Co-Medical Director at the Cedars-Sinai Spine Center at Cedars-Sinai Medical Center in Los Angeles and as the Medical Director of the Los Angeles Spine Institute in Santa Monica. During his career, Dr. Rick authored numerous authoritative texts and studies and operated on some of the most famous American businessman, lawyers, and athletes of his time.

15.     Plaintiff DEL-BLB, LLC, is a California limited liability company. Its sole member is Robert Grieg, in his capacity as trustee for 1) the Lisa Anna Delamarter 2016 Irrevocable Trust; 2) the Bri-Anne Delamarter 2016 Irrevocable Trust; and 3) the Brian Rick Delamarter, Jr. 2016 Irrevocable Trust. Mr. Grieg resides in and is domiciled in the State of California and is therefore a citizen of the State of California.

16.     Defendant Gregory J. Vislocky (also referred to as "Defendant Vislocky") resides in and is domiciled in the State of Washington, and therefore is a citizen of the State of Washington.

17.     Defendant Harold G. Delamarter (also referred to as "Defendant Delamarter") resides in the States of Oregon and Washington. However, upon information and belief, he is domiciled in the State of Washington and therefore is a citizen of the State of Washington.

18.     Nominal Defendant PCI is incorporated in the State of Washington, with its principal place of business located in Vancouver, Washington in the County of Clark, and therefore is a citizen of the State of Washington.

19.     Nominal Defendant PSL is an Oregon limited liability company.  Its members are Brian Rick Delamarter, M.D., in his capacity as trustee of the Delamarter Family Trust U/T/D/ 6/11/93, a citizen of the State of California; DEL-BLB, LLC, a citizen of the State of California;

COMPLAINT (No. _____) – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

and Gregory J. Vislocky and Harold G. Delmarter, both citizens of the State of Washington. Therefore, PSL is a citizen of the States of California and Washington.

20.     Venue for this action properly lies in this District pursuant to 28 U.S.C. §§ 1391(a), (b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in Clark County, Washington, which is where PCI and PSL share their principal place of business and where Defendants participated in the actions giving rise to this lawsuit. Moreover, Defendants reside in and are domiciled in Clark County, Washington.

21.     This Court also has personal jurisdiction over the Defendants. Defendants are domiciled in and Nominal Defendants PCI and PCL are citizens of the State of Washington. Plaintiffs' claims against Defendants arise out of their activities in the State of Washington, where Prestige conducts business and from where Defendants carry out their employment with Prestige. Defendants activities giving rise to Plaintiffs' claims against them include, but are not limited to: their purported approval of millions of dollars of bonus payouts to a select number of Prestige's employees and their decision to raise the pay of a select number of Prestige's employees by 22.5% without calling a duly noticed Board meeting or obtaining the unanimous written consent of Prestige's Board, and other ongoing acts of mismanagement which they have carried out in their roles with Prestige.

22.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as Does 1 through 10, and therefore sues these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of these Defendants when ascertained. Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named Defendants Does 1 through 10, inclusive, caused and/or participated in each of the acts and omissions of each of the named Defendants hereinafter alleged, and in so doing, acted as the agent, employee, and/or co-conspirator of said Defendants, and acted within the scope and in furtherance of said agency, employment, or conspiracy.

COMPLAINT (No. _____) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

23.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### *Prestige Care, Inc. ("PCI")'s Corporate Governance and Management Structure*

24.     In 1994, Prestige Care, Inc., then an Oregon corporation, merged into Quality Care, Inc., a Washington Corporation, which in turn changed its name to Prestige Care, Inc. ("PCI").

25.     On May 11, 1995, PCI adopted Amended and Restated Articles of Incorporation (the "Articles"), a copy of which is attached hereto as **Exhibit 1.** Article V of PCI's Articles provides, *inter alia,* "In furtherance and addition to, and not in limitation of, the powers conferred on directors by law, the Board of Directors is expressly authorized to: (1) To manage the business and affairs of this Corporation and to appoint and remove all officers, agents, fiduciaries, employees, contractors, counsel, auditors and others and to fix their compensation [emphasis added]…"

26.     On November 12, 1997, PCI adopted Articles of Amendment to its Articles, which added an additional Article to the Articles, but which did not change or otherwise alter the provisions of Article V.

27.     In addition to its Articles, PCI operates in accordance with a set of Bylaws, which were last amended on January 6, 2017. A copy of PCI's Amended Bylaws (the "Bylaws") are attached hereto as **Exhibit 2.**

28.     PCI's Bylaws vest the Board of Directors with "sole responsibility for the management of the business of the corporation" and "all of the powers possessed by the corporation itself." Bylaws, Ex. 2, § 2.12.

29.     This includes the "power to determine what amount constitutes net earnings of the Corporation, what amount shall be reserved for working capital and for any other purpose, and

COMPLAINT (No. _____) – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

what amount shall be declared as dividends, and such determinations by the Board of Directors shall be final and conclusive, except as otherwise provided by the Washington Business Corporation Act and the Articles of Incorporation." *Id.*

30.    Since the enactment of the Bylaws, PCI's Board of Directors, or "Board of Governors," has consisted of three (3) directors, Dr. Rick, Defendant Delamarter, and Defendant Vislocky.

31.    The vote of the majority of PCI's directors constituting a quorum <u>at a duly noticed board meeting</u> [emphasis added] is "the act of the Board of Directors." Bylaws, Ex. 3, § 2.9.

32.    In the absence of a duly noticed Board meeting, the Board may take action through unanimous written consent. Bylaws, Ex. 3, § 2.10.

33.    "The Board may elect one of its members the Chairman of the Board of Directors. The Chairman <u>shall</u> advise and consult with the Board of Directors and the officers of the corporation as to the determination of policies of the corporation, shall preside at all meetings of the Board of Directors and of the shareholders, and shall perform such other functions and responsibilities as the Board of Directors shall designate from time to time." Bylaws, Ex. 3, § 2.14 [emphasis added].

34.    Dr. Rick has served as the Chairman of the Board of PCI at all times subsequent to the enactment of the Bylaws in 2017.

35.    PCI's Bylaws also provide for corporate officers, including a President, Chief Operating Officer, Executive Vice President, Secretary, Treasurer, and Chief Executive Officer. Bylaws, Ex. 3, §§ 3.1-3.7.

36.    The Company's Chief Executive Officer is tasked with "general supervision over the property, business and affairs of the corporation," and to take actions "necessary and appropriate to implement the policies, goals and directions of the Board of Directors." Bylaws, Ex. 2, § 3.7.

COMPLAINT (No. _____) – 10

37.     The Company's Executive Vice President is tasked with "performing[ing] all of the duties of the President during the absence or disability of the President and Chief Operating Officers, if any, and shall perform such other duties as may be prescribed the board of Directors…" Bylaws, Ex. 2, § 3.4.

38.     Defendant Delamarter has held the title of Chief Executive officer at all times subsequent to the enactment of the Bylaws in 2017. Defendant Vislocky has held the title of Executive Vice President of Finance. Despite bearing significant responsibilities under PCI's Bylaws and each receiving a six-hundred thousand dollar ($600,000) salary, Defendants have effectively served in ceremonial roles, having shirked their duties to oversee the day-to-day management of the Company. Despite their refusal to fulfill their duties under the Bylaws, Defendants have opposed efforts to hire a duly qualified and responsible Chief Executive Officer and Executive Vice President of Finance. Instead, in an effort to consolidate power, Defendants have delegated much of their responsibilities to the Management Team, which includes Defendant Delamarter's two sons, Jason Delamarter—who holds the title of "Chief Operating Officer"—and Justin "Ryan" Delamarter—who holds the title of "General Counsel" and serves as the Company's top lawyer.

39.     PCI's Articles authorize the issuance of twenty thousand shares (20,000) of Common Stock. The issued and outstanding shares of PCI's Common Stock are currently held by the following shareholders in accordance with the following percentage shares: 1) Dr. Rick, as Trustee of the Delamarter Family Trust U/T/D 6/11/93: 27.78%; 2) DEL-BLB LLC: 13.89%; 3) Defendant Vislocky: 30%; and 4) Defendant Delamarter: 28.33%.

40.     As the trustee of the Delamarter Family Trust and as Manager of DEL-BLB, LLC, Dr. Rick, in addition to serving as Chairman, controls the single largest shareholding group of PCI.

41.     However, combining their two shares in the Company, Defendants control the

COMPLAINT (No. _____) – 11

majority of PCI's Common Stock.

*Prestige Senior Living, LLC's ("PSL")'s Corporate Governance and Management Structure*

42.     Like PCI, PSL is owned by Defendants and entities controlled and managed by Dr. Rick. Dr. Rick, as Trustee of the Delamarter Family Trust U/T/D 6/11/93, owns a 27.78% membership interest in PSL and DEL-BLB LLC owns a 13.89% membership interest in PSL. Defendants own the remaining membership interests of PSL in the same proportion to their ownership interest in PCI.

43.     PSL's Articles of Organization do not specify that the entity is a manager-managed entity, as required by Oregon law for the entity to be managed by a manager (*see* ORS § 63.047). *See* PSL's Articles of Organization, **Exhibit 3** attached hereto. Indeed, since at least 2014, PSL has been operated and controlled in the same manner as PCI, with the members of PSL—who are the same shareholders in PCI—jointly managing the entity.

44.     For example, dating back to at least 2014, PCI and PSL have held joint meetings of the "Board of Directors," consisting of Defendants and Dr. Rick. Additionally, upon information and belief, PCI and PCL share the same corporate officers. PCI and PSL's leadership make decisions based on combined financial documents, employ the same lawyers, and functionally work hand in hand to advance their mutual interests.

45.     Notwithstanding these facts, Plaintiffs and Defendants did enter into a Second Amended and Restated Operating Agreement of PSL on September 1, 2014, which was subsequently amended on July 15, 2016 (collectively, the "Operating Agreement"). Attached hereto as **Exhibit 4** is a copy of the operative Operating Agreement (including the July 15, 2016 amendment). Under the Operating Agreement, Defendant Vislocky holds the role of a "Manager" Member.

*Prestige's Declining Financial Health and History of Mismanagement*

46.     Starting in or around 2016, Prestige began consistently losing millions of dollars,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

year after year, despite its sizable foothold in the senior care industry. In order to stabilize the Company, Defendants and Dr. Rick agreed to liquidate various assets and use distributions to stabilize the Company. Over the last five years, this has resulted in Dr. Rick and Defendants infusing $25 million into the Company to ensure it had enough cash on hand to meet its liabilities, in the hopes that the Company's finances would turn around.

47.     For the past five years, this cash infusion has kept Prestige's overall operations running. However, it has proved to be a Band-Aid for the Company's deep rooted management issues, which largely stem from the fact that Defendants and the Management Team operate Prestige like a small family-run business when Prestige (together with a general partnership known as D.D.&F. owned by Dr. Rick and Defendants.) is currently generating approximately $390 million in revenue.

48.     Prestige has been forced to close numerous facilities, terminate management contracts, defer taxes, seek government loans and private lines of credit, and delay and avoid much needed repairs to its surviving facilities. Additionally, and notably, Prestige has become the subject of multiple litigations resulting in millions of dollars in losses. This includes the aforementioned lawsuit brought by the EEOC, which resulted in a $2 million settlement that Prestige is still make payments towards, on top of the approximately half a million dollars of legal fees and costs that Prestige expended to respond to and fight the lawsuit. Prestige is also actively responding to and defending a Department of Justice investigation into its practices, which has cost Prestige in excess of a hundred thousand dollars in legal fees to respond to and defend and will likely costs tens upon hundreds of thousands of dollars more.

49.     Prestige's finances have been declining rapidly, with its working capital decreasing by approximately $1.2 million each month. In addition to declining working capital, Prestige owes $700,000 toward a legal settlement due in November 2021 and over $8 million dollars in deferred social security taxes, $4 million of which are due in December 2021 with an

COMPLAINT (No. _____) – 13

1  additional $4 million due in December 2022. This has placed Prestige on the brink of insolvency.

2  In fact, based on cash flow projections from November 2021, the Company was projected to be

3  insolvent (based on its available cash) by January 2022 unless it received another government

4  bailout (having previously received Paycheck Protection Program (PPP) loans in 2020). It is

5  expected that the debts Prestige owes on its credit line, EEOC settlement, and other obligations,

6  such as pay raises and bonuses and Defendants' exorbitant salaries, will soon exceed its cash on

7  hand.

8  ***Defendants Engage in Ultra Vires Acts***

9     50.     Notwithstanding red flags signaling operational problems at the Company, in or

10  around 2020, the Company's Management Team—including Defendant Delamarter's two

11  children—began clamoring for pay raises, bonuses, and a stock plan to incentivize them to

12  perform their duties. Defendants, preferring to placate the Management Team and maintain the

13  status quo (in which Defendants had minimal involvement in the Company's operations and

14  were paid handsomely), rather than confront Prestige's financial woes, gave in to their

15  subordinates' requests.

16     51.     Unbeknownst to Dr. Rick, Defendants, in or around January 2020 without calling

17  a duly noticed Board meeting or seeking Dr. Rick's advisement and consent, caused the

18  Company to pay the Management Team a collective bonus approximating $700,000, purportedly

19  based on the Company's 2019 fiscal year performance.

20     52.     Regrettably, Dr. Rick only learned of the bonus pay-out after the fact sometime in

21  September of 2020. When Dr. Rick learned of the bonuses, he raised objections to Defendants,

22  informed them they could not pay the bonuses without consulting with him and without

23  following proper procedure, and demanded they never engage in the behavior again. Defendants

24  apologized and agreed not to pay future bonus compensation to Company employees again

25  without properly communicating with Dr. Rick.

26  COMPLAINT (No. _____) – 14

53.     Additionally, unbeknownst to Dr. Rick, in or around the summer of 2020, Defendant Vislocky engaged Company counsel to craft for the Management Team a long term bonus plan, new employment agreements with a built-in bonus structure, and a restricted stock plan to present to Prestige's Board of Directors. Ultimately, Defendants allowed Defendant Delamarter's children to work with Company counsel to revise and develop the various employment agreements.

54.     The discussions over the various employment agreements unfolded over a series of months, stretching from approximately August 2020 to March 2021. However, Defendants did not involve Dr. Rick in discussions with Company counsel until in March 2021, when Dr. Rick was forced to reach out to Company himself. By March 2021, Company counsel had expended $50,000 in legal fees drafting and revising the employment agreements to further compensate the Company's highest paid employees (aside from Defendants), without the oversight and involvement of the Company's Chairman.

55.     In or around March 2021, when Dr. Rick received drafts of the employment agreements from Company Counsel, he began a thorough review and analysis of the plans and engaged in follow-up discussions with Defendants and Company Counsel. Dr. Rick conveyed his belief that any bonus structure should be contingent on the performance of the Company and/or any potential sale of the Company, at which time any remaining surplus funds could be distributed to the individuals who helped make the Company profitable to its shareholders. Dr. Rick understood, based on his conversations with Defendants, that an appropriate bonus package for the Company's executives would be vetted, drafted, and discussed amongst the Company's Board, and that only after that occurred would the Board vote on the bonus plans at a duly noticed Board meeting.

56.     However, before Dr. Rick could complete his review and analysis, on or around March 15, 2021, Defendants, for a second time, purposefully hid their conduct from Dr. Rick and

COMPLAINT (No. _____) – 15

caused the Company to pay approximately $2 million in short term bonus distributions to the Management Team, which included Defendant Delamarter's children, purportedly based of the fiscal performance of Prestige for the prior fiscal year. Then, at some point, while Dr. Rick was revising the agreements drafted by Company counsel, Defendants unilaterally purported to approve a 22.5% salary increase to the Management Team in violation of the Bylaws.

57.     Defendants' payment of bonus distributions and exorbitant salary increases to the Management Team violated the express provisions of PCI's Bylaws and Articles, which require the Board of Directors to act as a *collective* body, task the Board with setting the compensation of the Company's executives, dictate that the Board cannot take action without a duly noticed board meeting or unanimous written consent of its Directors, and require the Board to consult with and seek the Chairman's input regarding the policies of the Company.

58.     Defendants' payment of the bonuses and pay raises to the Management Team also ignored legal advice rendered by Company counsel in November 2020. Specifically, on November 10, 2020, Company counsel communicated via e-mail with Defendant Gregory Vislocky reminding him of the foregoing provisions of PCI's Bylaws and summarizing the duties of PCI's Board of Directors. Upon information and belief, Defendant Vislocky shared his communications with the Company's lawyers with Defendant Delamarter.

59.     In addition to the surreptitious manner in which Defendants caused the Company to pay the bonuses and pay raises to the Management Team, Defendants lacked any justification for distributing millions of dollars in bonuses and pay raises to a select number of Prestige's executives, including Defendant Delamarter's children, given Prestige's financial condition.

60.     With respect to the bonuses paid on or around March 15, 2021 specifically, Prestige's financial performance in 2020 did not warrant discretionary distributions to the Management Team at all. The Company's 2020 financial statements reflect Prestige was buoyed by deferred social security taxes (which are now due at the end of 2021 and 2022) and a

COMPLAINT (No. _____) – 16

1   substantial Paycheck Protection Program (PPP) loan, which had yet to be forgiven or paid back.

2   Excluding the government loans and tax deferments, Prestige *lost* money in 2020 and did not

3   have sufficient funds available to invest in long overdue capital expenditures, including

4   necessary repairs to its facilities' structures. Accordingly, Prestige's own auditors concluded at

5   the end of 2020 that the Company would have problems continuing as a going concern. In fact,

6   as previously noted, Prestige lost so much money in the years prior to 2020 under the same

7   Management Team that received the unapproved bonuses, that Dr. Rick and Defendants had to

8   liquidate various assets, including selling some buildings at a discount, liquidate an insurance

9   fund, and invest this capital ($25 million) into Prestige in order for it to survive.

10          61.     The bonuses and salary increases currently being paid by Prestige due to

11   Defendants' *ultra vires* acts were based on a snapshot in time, ignoring the Company's perilous

12   financial condition, heavy debt load, and the fact that the Company was being propped up by

13   PPP loans. This is evident from recent cash flow projections of the Company, which as described

14   above, show that Prestige will soon be insolvent, unless it receives millions in additional cash in

15   some form.

16          ***Defendants Refuse to Remedy or Correct Their Illicit Acts Upon Demand by Dr. Rick***

17          62.     In June 2021, Dr. Rick learned that Defendants approved and began distributing

18   $2 million in "bonuses" from Prestige's coffers to the Management Team on or around March

19   15, 2021. Thereafter, during a telephone call with Defendants in June 2021, Defendant Vislocky

20   indicated the payment of the bonuses to the Management Team, "was not right."

21          63.     Dr. Rick then followed up with Defendant Vislocky directly in hopes of

22   addressing the bonus payments. However, Defendant Vislocky responded by hanging up the

23   telephone on Dr. Rick when he brought up the bonuses.

24          64.     On June 25, 2021, Dr. Rick, through his attorneys, made written demand upon

25   Defendants to stop payment on the short term bonus payouts and called for a special meeting of

26

COMPLAINT (No. _____) – 17

1  the Board of Directors to address Defendants' misconduct, which Dr. Rick outlined in detail in

2  his June 25, 2021 written demand.

3       65.    On July 16, 2021, Defendants and Dr. Rick met for a special meeting of Prestige's

4  Board of Directors to discuss, among other things, Defendants' payment of the unlawful short

5  term bonuses.

6       66.    During the July 16, 2021 meeting, Dr. Rick made the followings motions: 1) To

7  halt all payments of the short-term bonuses that Defendants purported to approve on March 15,

8  2021 without a duly noticed Board of Director meeting or the unanimous written consent of the

9  Company's shareholders; 2) To remove Defendant Delamarter as Chief Executive Officer of

10  Prestige based on his history of hiding and failing to disclose material information to the Board

11  of Directors, including prior unauthorized bonus payouts to the Company's employees; 3) To

12  remove Defendant Vislocky as Executive Vice President of the Company, based on his history of

13  hiding and failing to disclose material information to the Board of Directors, including prior

14  unauthorized bonus payouts to the Company's employees; and, 4) To direct the Company to take

15  all necessary actions to recover payment of all unauthorized funds pursuant to the unapproved

16  short term bonus payout, including from those individuals who caused such funds to be

17  withdrawn from the Company. Both Defendant Delamarter and Defendant Vislocky refused to

18  second the motions, effectively causing all of Dr. Rick's motions to fail.

19       67.    At the July 16, 2021 special meeting of the Board of Directors, Dr. Rick also

20  learned for the first time that Defendants, without conducting a Board meeting or receiving

21  Board approval, had covertly caused Prestige to begin paying the Management Team 22.5% pay

22  increases in 2021.

23       68.    Remarkably, prior to the July 16, 2021 special meeting of the Board of Directors,

24  Company counsel sent *another* email to Defendant Vislocky regarding the bonuses which

25  Defendants caused the Company to begin paying on March 15, 2021 without Dr. Rick's

26

COMPLAINT (No. _____) – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

advisement and consent. Upon information and belief, Defendant Vislocky shared the email with Defendant Delamarter. Company counsel once more reminded Defendants of the relevant provisions of Prestige's Bylaws, identified a conflict of interest relating to the award of bonuses to Defendant Delamarter's sons, and made various recommendations to Defendants to properly follow the Bylaws regarding the bonuses. As evidenced by the outcome of the July 16, 2021 special meeting, Defendants ignored all of this advice.

69.     Over the next several months, Dr. Rick continued to attempt to informally resolve his disputes with Defendants short of litigation, including by making yet another written demand upon them on September 16, 2021 setting forth in greater detail the extent of the ongoing corporate mismanagement at Prestige. However, Defendants refused to give any consideration to Dr. Rick's proposals or the concerns he raised, effectively daring him to file the instant lawsuit.

### Defendants Continue Their Reckless Path and Encumber the Assets of Their General Partnership with Dr. Rick to Guaranty the Debts of Prestige

70.     In order to maintain functions at various care facilities operated by Prestige (in addition to having to cover liabilities created by the salary increases and bonus payments), Defendants called a Special Meeting of the Board of Directors of PCI and a meeting of the general partners of D.D.&F. on December 28, 2021 to approve a $6 million revolving line of credit.

71.     The proposed line of credit was contingent upon PCI and D.D.&F.—a general partnership owned and operated by Defendants[9] and Dr. Rick, and which controls the real estate leased by PCI's subsidiaries—guaranteeing the obligations of PCI's subsidiaries under the proposed credit line.

72.     During the December 28, 2021 meeting, Dr. Rick objected to the approval of the

---

[9] Defendant Harold Delamarter owns his partnership interest as a joint tenancy with right of survivorship with his wife Elizabeth G. Delamarter.

COMPLAINT (No. _____) – 19

proposed loan documents as drafted, stating they contained false representations and omissions, which Dr. Rick believed to be fraudulent, including, among other things that PCI was solvent and that no litigation had been threatened against PCI, which would cause a material adverse change in its business or financial condition, and which failed to disclose the ongoing Department of Justice investigation. Dr. Rick also objected that Defendants failed to afford him or his lawyers adequate time to review the loan documents, having sent them the day before the Christmas holiday. Further, Dr. Rick objected to Defendants' committing D.D.&F. to guaranty the debts of PCI's subsidiaries, thereby exposing Dr. Rick to significant personal liability. Over Dr. Rick's objections, Defendants voted to approve resolutions approving PCI's and D.D.&F.'s personal guaranty of the $6 million revolving credit line.

17.     Notably, without a credit line, Prestige cannot afford to continue to pay exorbitant salaries to Defendants and the Management Team and to pay bonuses to the Management Team.

## **DEMAND FUTILITY**

73.     Based upon applicable law (including, but not limited to Revised Code of Washington ("RCW") § 23B.07.400(2) and Oregon Revised Statutes ("ORS") § 63.801) the facts alleged in this Complaint, and the longstanding rule that equity does not compel a useless and futile act, Plaintiffs are excused from any requirement to make a formal request to the Board of Directors of PCI and the Members of PSL to bring the instant action, particularly as Plaintiff have previously made demands upon Defendants to address and remedy the wrongs described in this Complaint, including through, but not limited to, Dr. Rick's written demands to Defendants on June 25, 2021 and September 16, 2021 and through oral communications during the special meeting of Prestige's Board of Directors on July 16, 2021 and an attempted pre-litigation settlement meeting with Defendants on October 19, 2021. Regrettably, in each instance, Defendants refused to acknowledge their wrongdoing and even denied it. Defendants also refused to stop payment on and refund to Prestige the illicit bonus payments and salary increases

COMPLAINT (No. _____) – 20

they caused the Company to issue.  In addition, Plaintiffs are suing the two persons forming the majority of PCI's Board of Directors, and the majority of outstanding stock in PCI and membership interests in PSL. Therefore, a further pre-submission demand would be a useless and futile act as such a request would require the majority of the Board of Directors of PCI and Members of PSL to recommend legal action against themselves.

## DERIVATIVE CLAIM STANDING

74. At the time of the transactions complained of herein, Dr. Rick, as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, was the record holder of no less than 27.78% of the Common Stock of PCI and no less than 27.78% of the membership interests of PSL.

75. At the time of the transactions complained of herein, DEL-BLB, LLC, was the record holder of no less than 13.89% of the Common Stock of PCI and no less than 13.89% of the membership interests of PSL.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty on Behalf of Prestige Care, Inc. as against Defendants in their Capacities as Officers and Directors of PCI)

76. Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, derivatively, on behalf of PCI, allege against Defendants and Does 1-10 Breach of Fiduciary Duty on the following grounds:

77. Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 75 of this Complaint as though fully set forth herein.

78. Defendants owe fiduciary duties to PCI as members of PCI's Board of Directors and as officers of the Company.

79. Due to their positions and activities, Defendants were obligated to exercise due care and conduct their activities in good faith and in the best interests of PCI and its shareholders.

COMPLAINT (No. _____) – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

80.     Despite these obligations, Defendants willfully and intentionally violated their duties of care and duty of loyalty (as to Defendant Delamarter only) by causing the Company to distribute approximately $2.7 million in bonuses to its Management Team dating back to 2020, in addition to 22.5% salary increases to the Management Team in 2021 (the "Acts") while (a) usurping the role of PCI's Board of Directors and Chairman of the Board; (b) failing to either (i) hold a duly noticed Board Meeting to discuss and vote on the bonuses and salary increases to the Company's Management Team or (ii) secure the unanimous written consent of the Company's Board of Directors prior to undertaking the Acts, in breach of the Company's Articles and Bylaws; (c) intentionally failing to disclose to PCI's Chairman the bonus payments until several months after they occurred; (d) undertaking the Acts despite (i) that the financial performance of PCI in 2019 and 2020 did not warrant discretionary distributions or salary increases to the Management Team at all, (ii) PCI's projected insolvency, (iii) PCI's outstanding tax deferments, government loans, and other debts, (iv) PCI's long overdue capital expenditures, and (v) PCI's pending litigations and costly legal settlements, including the EEOC settlement and pending Department of Justice investigation; (e) failing to follow the legal advice of PCI's lawyers which explicitly advised Defendants regarding the roles and responsibilities of the Company's Board of Directors, which Defendants failed to honor; (f) ignoring and/or refusing the reasonable requests of the Chairman to recoup the illicitly paid bonuses after written demands were made upon Defendants and after Company counsel again rendered legal advice to Defendants in June 2021, which put them on notice that they committed *ultra vires* acts; (g) lying to Dr. Rick in 2020 and informing him that bonuses would not be paid again to the "Management Team" without proper approval; and, (h) as to Defendant Harold G. Delamarter, failing to abstain from participating in and voting on the payment of the aforementioned bonuses and salary increases to his two children (a conflict of interest), despite engaging in a process that was fundamentally unfair to PCI.

COMPLAINT (No. _____) – 22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

81.     While diligent directors and officers of PCI in observing their duties of care and loyalty would have made every effort to avoid causing the Company to engage in the Acts, Defendants failed to act in the best interests of PCI's shareholders and deprived PCI of much needed cash in so doing.

82.     The process Defendants engaged in to cause the Company to make pay $2.7 million in bonus compensation and 22.5% salary increases was procedurally unfair to PCI, as they were based on intentional and knowing violations of the PCI's governing documents and deceit in the form of intentional non-disclosure of material information to the Chairman of the Board. Moreover, the Acts were substantively unfair to PCI, for those reasons described herein.

83.     In addition to all of the foregoing, Defendants breached their fiduciary duty to PCI by causing the Company to approve a $6 million credit line extended to its subsidiaries in which PCI guarantied its subsidiaries' obligations based on knowingly false representations and material omissions to its subsidiaries' lender.

84.     Based on the Defendants' actions, PCI has been damaged in an amount subject to proof at trial in excess of $3 million.

## SECOND CAUSE OF ACTION

**(Breach of Fiduciary Duty on behalf of Dr. Rick as Trustee of the Delamarter Family Trust U/T/D 6/11/93 and DEL-BLB LLC against Defendants in their Capacity as Majority Shareholders)**

85.     Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, allege against Defendants and Does 1-10 Breach of Fiduciary Duty on the following grounds:

86.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 84 of this Complaint as though fully set forth herein.

87.     PCI is a privately owned corporation owned by four shareholders—1) Dr. Rick, in

COMPLAINT (No. _____) – 23

his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93; 2) DEL-BLB, LLC; 3) Defendant Delamarter; and, 4) Defendant Vislocky.

88.     Defendant Delamarter and Defendant Vislocky collectively own the majority of the issued, outstanding Common Stock of PCI, with Defendant Delamarter owning 28.33% of PCI's outstanding Common Stock and Defendant Vislocky owning 30% of PCI's outstanding Common Stock. Collectively, Defendant Delamarter and Defendant Vislocky own 58.33% of the Common Stock of PCI.

89.     Due to the closely held nature of PCI and Defendants' position as the controlling shareholder group of PCI, Defendants owed Plaintiffs, as minority shareholders, a fiduciary duty to exercise good faith toward Plaintiffs at all times and to refrain from acting in a manner that is illegal, oppressive, or fraudulent.

90.     Despite their obligations to Plaintiffs, Defendants willfully and intentionally violated their duties of care and duty of loyalty (as to Defendant Delamarter only) by causing the Company to distribute approximately $2.7 million in bonuses to its Management Team dating back to 2020, in addition to 22.5% salary increases to the Management Team in 2021 (the "Acts") while (a) usurping the role of PCI's Board of Directors and Chairman of the Board; (b) failing to either (i) hold a duly noticed Board Meeting to discuss and vote on the bonuses and salary increases to the Company's Management Team or (ii) secure the unanimous written consent of the Company's Board of Directors prior to undertaking the Acts, in breach of the Company's Articles and Bylaws; (c) intentionally failing to disclose to PCI's Chairman the bonus payments until several months after they occurred; (d) undertaking the Acts despite (i) that the financial performance of PCI in 2019 and 2020 did not warrant discretionary distributions or salary increases to the Management Team at all, (ii) PCI's projected insolvency, (iii) PCI's outstanding tax deferments, government loans, and other debts, (iv) PCI's long overdue capital expenditures, and (v) PCI's pending litigations and costly legal settlements, including the EEOC

COMPLAINT (No. _____) – 24

settlement and pending Department of Justice investigation; (e) failing to follow the legal advice of PCI's lawyers which explicitly advised Defendants regarding the roles and responsibilities of the Company's Board of Directors, which Defendants failed to honor; (f) ignoring and/or refusing the reasonable requests of the Chairman to recoup the illicitly paid bonuses after written demands were made upon Defendants and after Company counsel again rendered legal advice to Defendants in June 2021, which put them on notice that they committed *ultra vires* acts; (g) lying to Dr. Rick in 2020 and informing him that bonuses would not be paid again to the "Management Team" without proper approval; and, (h) as to Defendant Harold G. Delamarter, failing to abstain from participating in and voting on the payment of the aforementioned bonuses and salary increases to his two children (a conflict of interest), despite engaging in a process that was fundamentally unfair to PCI.

91.     Defendants' actions failed to meet the reasonable expectations of Plaintiffs, as evidenced from Defendants' blatant breaches of PCI's governing documents, including its Bylaws and Articles, and particularly in light of the fact that when Defendants caused PCI to pay $700,000 in short term bonuses to the Management Team in January 2020, Defendants assured Dr. Rick this would not happen again without proper approval.

92.     Defendants' Acts demonstrate they have failed to engage in fair dealing with Plaintiffs, as they have siphoned off of the Company's declining cash reserves through excessive and poorly timed salaries and bonus payments, thereby depriving Plaintiffs of returns on their investments in PCI.

93.     In addition to all of the foregoing, Defendants breached their fiduciary duty to PCI by causing the Company to approve a $6 million credit line extended to its subsidiaries in which PCI guarantied its subsidiaries' obligations based on knowingly false representations and material omissions to its subsidiaries' lender.

94.     Based on the actions of Defendants, Plaintiffs have been damaged in an amount

COMPLAINT (No. _____) – 25

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

representing their pro rata share of distributions in excess of $3 million.

### THIRD CAUSE OF ACTION

**(Breach of Contract on behalf of Prestige Care, Inc. against Defendants)**

95.     Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, derivatively, on behalf of PCI, allege against Defendants and Does 1-10 Breach of Contract on the following grounds:

96.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 94 of this Complaint as though fully set forth herein.

97.     PCI's Articles (**Exhibit 1**) and Bylaws (**Exhibit 2**) are valid contracts between PCI and its shareholders and directors.

98.     Defendants are shareholders and directors of PCI.

99.     Defendants breached PCI's Articles, when, or around January 2020, Defendants caused the Company to pay $700,000 in discretionary, short-term bonuses to a select number of PCI's Management Team, without permitting PCI's Board of Directors an opportunity to decide all issues related to the compensation of its executives, officers, and employees, or to delegate said decision-making in violation of Article V of its Articles.

100.     Defendants further breached PCI's Articles when, on or around March 15, 2021, Defendants caused the Company to pay $2 million in discretionary, short-term bonuses to PCI's Management Team and issued the same persons 22.5% pay increases without permitting PCI's Board of Directors to decide all issues related to the compensation of its executives, officers, and employees, or to delegate said decision-making in violation of Article V.

101.     Defendants breached PCI's Bylaws when, or around January 2020, Defendant caused the Company to pay $700,000 in discretionary, short-term bonuses to a PCI's Management Team without 1) securing the approval of a majority of PCI's Board at a duly noticed Board of Director meeting, in violation of Sections 2.9 and 2.12 of PCI's Bylaws;

COMPLAINT (No. _____) – 26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

2) securing the unanimous written consent of PCI's directors, in violation of Sections 2.10 and 2.12 of PCI's Bylaws; and, 3) properly consulting and advising with PCI's Chairman of the Board, in violation of Section 2.14 of PCI's Bylaws.

102.    Defendants breached PCI's Bylaws when, or around March 15, 2021, Defendants caused PCI to pay $2 million in discretionary, short-term bonuses to PCI's Management and issued the same persons 22.5% pay increases without 1) securing the approval of a majority of PCI's Board at a duly noticed Board of Director meeting, in violation of Sections 2.9 and 2.12 of PCI's Bylaws; 2) securing the unanimous written consent of PCI's directors, in violation of Sections 2.10 and 2.12 of PCI's Bylaws; or 3) properly consulting and advising with PCI's Chairman of the Board, in violation of Section 2.14 of PCI's Bylaws.

103.    As a direct, proximate and foreseeable result of Defendants' breaches, PCI has been damaged in an amount subject to proof at trial in excess of $3 million.

### FOURTH CAUSE OF ACTION

**(Breach of Fiduciary Duty on Behalf of Prestige Senior Living, LLC against Defendants)**

104.    Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, derivatively on behalf of PSL, allege against Defendants and Does 1-10 Breach of Fiduciary Duty on the following grounds:

105.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 103 of this Complaint as though fully set forth herein.

106.    Since on or around September 1, 2014, Defendant Vislocky has held the role of "Manager," with PSL pursuant to its Operating Agreement.

107.    As such, Defendant Vislocky has served in the role of "Managing Member" of PSL and enjoyed those responsibilities set forth in the Operating Agreement, subject to the above-described provisions of Oregon law and consistent with the fiduciary duties of loyalty and due care owed to PSL

COMPLAINT (No. _____) – 27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    108.    Similarly, as a Member of PSL, Defendant Delamarter has at all times owed a

2  fiduciary duty of loyalty and due care to PSL and its members.

3    109.    Members and "Manager-Members" must carry out their fiduciary duties

4  consistent with the obligation of good faith and fair dealing.

5    110.    Nevertheless, Defendants willfully and intentionally violated their fiduciary duties

6  to PSL by working together to cause Prestige to distribute in excess of $2.7 million in bonuses to

7  its Management Team dating back to 2020 and 22.5% salary increases during the 2021 fiscal

8  year (the "Acts") while (a) failing to hold a duly noticed Member Meeting to discuss and vote on

9  short-term bonuses and pay raises to the Company's Management Team consistent with the

10  custom and practice of Prestige; (b) intentionally failing to disclose the bonus payments to Dr.

11  Rick until several months after they occurred; (c) undertaking the Acts despite (i) that the

12  financial performance of PSL in 2019 and 2020 did not warrant discretionary distributions or

13  salary increases to the Management Team at all, as evidenced by Prestige's projected insolvency,

14  its outstanding tax deferments, government loans, and debts still owed from the $25 million cash

15  infusion into Prestige between 2016 and 2019, (ii) Prestige's long overdue capital expenditures,

16  and, (iii) Prestige's pending litigations and costly legal settlements, including the EEOC

17  settlement and pending Department of Justice investigation; (d) failing to follow the legal advice

18  of PSL's lawyers; (e) ignoring and/or refusing the reasonable requests of Plaintiffs to recoup the

19  illicitly paid bonuses after written demands were made upon Defendants; (f) lying to Dr. Rick in

20  or around 2020 and informing him that short-term bonuses would not be paid again without

21  proper approval; and, (g) allowing Defendant Delamarter to participate in and vote in favor of

22  the payment of the aforementioned bonuses and salary increases to his two children, despite

23  Defendant Delamarter possessing a conflict of interest and despite engaging in a process that was

24  fundamentally unfair to PSL.

25    111.    In so committing the foregoing Acts, Defendants discharged their fiduciary duties

26

COMPLAINT (No. _____) – 28

to PSL in a grossly negligent or reckless manner and engaged in intentional misconduct.

112.    In so doing, Defendants failed to discharge their fiduciary duties to PSL consistent with the obligation of good faith and fair dealing, as evidenced by their purposeful non-disclosures and material misrepresentations to Dr. Rick.

113.    Defendants also failed to discharge their fiduciary duties to PSL consistent with the provisions of ORS § 63.130(4)(h) as the payment of short-term bonuses and salary increases to Defendant Delamarter's children involved a conflict of interest with Defendant Delamarter, and Defendants caused the payments to be made in a manner that was not fair to PSL, expressly authorized by an operating agreement, or ratified by a majority of the disinterested members of PSL.

114.    Based on the actions of Defendants, PSL has been damaged in an amount subject to proof at trial in excess of $3 million, subject to proof at trial.

### FIFTH CAUSE OF ACTION

**(Breach of Fiduciary Duty on Behalf of Dr. Rick and DEL-BLB, LLC as against**

**Defendants in their Capacities as Members of PSL)**

115.    Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, allege against a cause of action of Breach of Fiduciary Duty against Defendants in their capacities as Members and Does 1-10 on the following grounds:

116.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 114 as though set forth herein.

117.    Since on or around September 1, 2014, Defendant Vislocky has held the role of "Manager," with PSL pursuant to its Operating Agreement and enjoyed those responsibilities set forth in the Operating Agreement, subject to the above-described provisions of Oregon law and consistent with the fiduciary duties of loyalty and due care owed to Plaintiffs.

118.    Similarly, as a Member of PSL, Defendant Delamarter has at all times owed a

COMPLAINT (No. _____) – 29

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

1  fiduciary duty of loyalty and due care to Plaintiffs.

2  119.  Members and "Manager-Members" must carry out their fiduciary duties

3  consistent with the obligation of good faith and fair dealing

4  120.  Nevertheless, Defendants willfully and intentionally violated their fiduciary duties

5  to PSL by working together to cause Prestige to distribute in excess of $2.7 million in bonuses to

6  its Management Team dating back to 2020 and 22.5% salary increases during the 2021 fiscal

7  year (the "Acts") while (a) failing to hold a duly noticed Member Meeting to discuss and vote on

8  short-term bonuses and pay raises to the Company's Management Team consistent with the

9  custom and practice of Prestige (b) intentionally failing to disclose the bonus payments to Dr.

10  Rick until several months after they occurred; (c) undertaking the Acts despite (i) that the

11  financial performance of PSL in 2019 and 2020 did not warrant discretionary distributions or

12  salary increases to the Management Team at all, as evidenced by Prestige's projected insolvency,

13  its outstanding tax deferments, government loans, and debts still owed from the $25 million cash

14  infusion into Prestige between 2016 and 2019, (ii) Prestige's long overdue capital expenditures,

15  and, (iii) Prestige's pending litigations and costly legal settlements, including the EEOC

16  settlement and pending Department of Justice investigation; (d) failing to follow the legal advice

17  of PSL's lawyers; (e) ignoring and/or refusing the reasonable requests of Plaintiffs to recoup the

18  illicitly paid bonuses after written demands were made upon Defendants; (f) lying to Dr. Rick in

19  or around 2020 and informing him that short-term bonuses would not be paid again without

20  proper approval; and, (g) allowing Defendant Delamarter to participate in and vote in favor of

21  the payment of the aforementioned bonuses and salary increases to his two children, despite

22  Defendant Delamarter possessing a conflict of interest and despite engaging in a process that was

23  fundamentally unfair to PSL.

24  121.  In so committing the foregoing Acts, Defendants discharged their fiduciary duties

25  to Plaintiffs in a grossly negligent or reckless manner and engaged in intentional misconduct.

26

COMPLAINT (No. _____) – 30

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

122.     In so doing, Defendants failed to discharge their fiduciary duties to Plaintiffs consistent with the obligation of good faith and fair dealing, as evidenced by their purposeful non-disclosures and material misrepresentations to Dr. Rick.

123.     Defendants also failed to discharge their fiduciary duties to Plaintiffs consistent with the provisions of ORS § 63.130(4)(h) as the payment of short-term bonuses and salary increases to Defendant Delamarter's children involved a conflict of interest with Defendant Delamarter, and Defendants caused the payments to be made in a manner that was not fair to PSL, expressly authorized by an operating agreement, or ratified by a majority of the disinterested members of PSL.

124.     Based on the actions of Defendants, Plaintiffs have been damaged in an amount subject to proof at trial in excess of their pro rata share of over $2.7 million in distributions to PSL's members, subject to proof at trial.

## SIXTH CAUSE OF ACTION

### (Breach of Fiduciary Duty on Behalf of Dr. Rick, individually against Defendants in their Capacities as Partners of D.D.&F.)

125.     Plaintiff Dr. Rick, individually and in his capacity as a partner of D.D.&F., an Oregon general partnership, allege against Defendants and Does 1-10 an action for Breach of Fiduciary Duty on the following grounds:

126.     Plaintiff Dr. Rick incorporates by reference each and every allegation contained in paragraphs 1 through 124 as though set forth herein.

127.     Defendants owe fiduciary duties to Dr. Rick as his partners in D.D.&F., and Defendant Delamarter owes a fiduciary duty to Dr. Rick in his capacity as the Managing Partner of D.D.&F.

128.     Due to their positions and activities with D.D.&F., Defendants were obligated to exercise due care and conduct their activities in good faith and in the best interests of D.D.&F.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   and its partners.

2   129.   Despite these obligations, Defendants willfully and intentionally violated their

3   duties of care by voting, on December 28, 2021, to approve D.D.&F. personal guaranty of a line

4   of credit extended to subsidiaries of PCI totaling $6 million, without receiving any consideration

5   in return for the personal guaranty.

6   130.   In doing so, Defendants committed corporate waste and encumbered all of the

7   assets of D.D.&F., in addition to personally committing Dr. Rick to answer for the debts of PCI's

8   subsidiaries.

9   131.   Additionally, and notably, Defendants voted their partnership interests to approve

10   the personal guaranty despite having knowledge that the operative loan documents contained

11   patently false representations, including, among other things that PCI was solvent and that no

12   litigation had been threatened against PCI, which would cause a material adverse change in its

13   business or financial condition, and which failed to disclose the ongoing Department of Justice

14   investigation.

15   132.   Notwithstanding the false representations contained in the proposed loan

16   documents, the lack of any consideration, and substantial obligations imposed upon D.D.&F. and

17   its partners, Defendants voted their partnership interests to approve the guaranty of the $6

18   million line of credit.

19   133.   Given the foregoing, Defendants undertook the foregoing actions in bad faith and

20   without a reasonable basis for believing they were in accordance with the D.D.& F.'s operative

21   partnership agreement.

22   134.   Based on the foregoing actions, Dr. Rick has been damaged in an amount

23   approximating $2,500,200 representing Dr. Rick's 41.67% partnership interest of the $6 million

24   credit line liability.

25

26

COMPLAINT (No. _____) – 32

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## SEVENTH CAUSE OF ACTION

### (Accounting on Behalf of Prestige Care, Inc. as against Defendants)

135.    Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, derivatively allege on behalf of PCI against Defendants and Does 1-10 an action for Accounting on the following grounds:

136.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 134 as though set forth herein.

137.    As set forth above, Defendants have repeatedly and intentionally failed to disclose material information to the Chairman of the Board and Board of Directors bearing on matters exclusively within the purview of the Board to deliberate and vote upon, namely, the issue of compensation bonuses to Prestige's employees and executive management.

138.    A substantial amount of documents, and a full accounting will be required to analyze the manner in which the unlawful bonuses and salary increases were paid to PCI's upper management, who received payments, when they received payments, and from which accounts the bonuses were paid, in order to determine the precise balance due to PCI from Defendants' malfeasance.

139.    Dr. Rick previously made demand upon Defendants during a special meeting of the Board of Directors on July 16, 2021 to direct the Company to take all necessary action to recover payment of all unauthorized compensation bonuses; however, Defendants refused to adopt a resolution approving such action.

140.    To the extent there is no adequate remedy to address Defendants' breaches of their fiduciary duties and breach of PCI's Bylaws, Plaintiffs, derivatively on behalf of PCI, hereby respectfully request an accounting of PCI.

COMPLAINT (No. _____) – 33

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**EIGHTH CAUSE OF ACTION**

**(Accounting on Behalf of Prestige Senior Living, LLC as against Defendants)**

141.     Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, derivatively allege on behalf of PSL against Defendants and Does 1-10 an action for Accounting on the following grounds:

142.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 140 as though set forth herein.

143.     As set forth above, Defendants have repeatedly and intentionally failed to disclose material information to members of PSL, including, but not limited to, compensation bonuses paid to Prestige's Management Team.

144.     A substantial amount of documents, and a full accounting will be required to analyze the manner in which the bonuses and salary increases were paid to Prestige's Management Team, who received payments, when they received payments, and from which accounts the bonuses were paid, in order to determine the precise balance due to PSL from Defendants' malfeasance.

145.     Dr. Rick previously made demand upon Defendants during an emergency meeting of the members of PSL on July 16, 2021 to direct the Company to take all necessary action to recover payment of all unauthorized compensation bonuses; however, Defendants refused to adopt a resolution approving such action

146.     To the extent there is no adequate remedy to address Defendants breach of their fiduciary duties to PSL, Plaintiffs, derivatively on behalf of PSL, hereby respectfully request a full accounting of PSL.

**NINTH CAUSE OF ACTION**

(**Declaratory Relief on Behalf of Prestige Care, Inc as against Defendants**)

147.     Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust

COMPLAINT (No. _____) – 34

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

U/T/D/ 6/11/93, and DEL-BLB, LLC, derivatively allege on behalf of PCI an action for Declaratory Relief against Defendants and Does 1-10 on the following grounds:

148.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 146 as though set forth herein.

149.    An actual controversy has arisen and now exists between PCI, Dr. Rick and Defendants regarding their respective rights and duties as set forth in PCI's Bylaws. Plaintiffs, derivatively on behalf of PCI, hereby seek a declaratory judgment that Defendants Vislocky and Delamarter violated PCI's Bylaws and Articles when they caused PCI to issue compensation bonuses to PCI's Management Team in 2020 and 2021 totaling approximately $2.7 million, in addition to causing the Company to increase the salaries of PCI Management Team by 22.5% in or around March 2021 in the following ways: i) failing to secure the consent of the majority of directors at a duly noticed board meeting; ii) failing to secure the unanimous written consent of PCI's Board of Directors; and iii) failing to disclose and to properly consult with PCI's Chairman regarding the compensation bonuses and salary increases.

## **TENTH CAUSE OF ACTION**

### **(Injunctive Relief on Behalf of Prestige Care, Inc. against Defendants)**

150.    Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, individually and derivatively allege on behalf of PCI an action for Injunctive Relief against Defendants and Does 1-10 on the following grounds:

151.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 149 as though set forth herein.

152.    As set forth herein, Defendants have engaged in various acts of misconduct and specifically with respect to the payment of $2.7 million in compensation bonuses to Prestige's Management Team and 22.5% salary increases paid to Prestige's Management Team. Defendants have knowingly and intentionally violated PCI's Bylaws and Articles, ignored the

COMPLAINT (No. _____) – 35

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

legal advice of the Company's own lawyers in doings so, and prioritized increasing the compensation of the highest paid employees at the Company (besides Defendants) over ensuring that Prestige meets its obligations to the IRS, pays its debts to the federal government, private lenders, allocates sufficient funds for capital expenditures to improve the facilities Prestige and its affiliates operate, and otherwise avoids insolvency. Meanwhile, Defendants have effectively abandoned their posts as Chief Executive Officer and Executive Vice President of the Company, despite collecting six-hundred thousand dollar ($600,000) salaries. Defendants have also refused efforts of Dr. Rick to hire a qualified and competent CEO and EVP to administer Prestige and to keep PCI's Directors, its Chairman, and shareholders adequately informed so they can perform their functions and otherwise protect their investments in Prestige.

153. In order to protect and preserve the assets of PCI and the interests of its shareholders going forward, and to ensure appropriate management and operation of PCI, Plaintiffs, derivatively on behalf of PCI, request an Order enjoining Defendants from, *inter alia*:

    a.    Performing or causing to be performed any act on behalf of PCI which is required to be performed or approved by the Board of Directors, including, but not limited to, causing or allowing any form of compensation to be paid to any employee, officer, director, or other agent of PCI pursuant to the $2 million in bonus compensation Defendants purported to approve on behalf of the Company on or around March 15, 2021, in addition to the 22.5% salary increases to PCI's Upper Management which Defendants purported to approve on behalf of the Company on or around the same time;

    b.    Entering into any transactions, dealings, or agreements on behalf of PCI without consulting, in writing, with the Chairman, Dr. Rick, and giving Dr. Rick a reasonable opportunity to object and call a special meeting of

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

the Board of Directors;

    c.     Entering into any transactions, dealings, agreements on behalf of PCI, without consulting, in writing, with Dr. Rick, and securing the unanimous written consent of the Directors of PCI;

    d.    Taking any salary as an officer or director of PCI without the unanimous written consent of PCI's Board;

    e.    Purporting to approve any short-term or long-term bonuses plans, employment agreements, stock option plan, or other forms of employee benefits without consulting the Chairman of the Board, Dr. Rick, and securing the unanimous written consent of the Board of Directors;

    f.    Withholding any and all information, data, and documents necessary to the management and operations of PCI from the Chairman of the Board, Dr. Rick, including all relevant QuickBooks, financial and accounting data.

154.    PCI will be irreparably harmed if the foregoing relief is not immediately granted by way of an injunction as PCI's cash on hand is in danger of being imminently depleted, leaving PCI unable to meet its current liabilities, throwing PCI into insolvency and irreparably damaging PCI's credit and standing with its creditors.

155.    PCI has no adequate remedy for ensuring that its cash reserves are not materially injured during and after the pendency of trial in this matter.

## ELEVENTH CAUSE OF ACTION

**(Injunctive Relief on Behalf of Prestige Senior Living, LLC as against Defendants)**

156.    Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, individually and derivatively allege on behalf of PSL allege an action for Injunctive Relief against Defendants and Does 1-10 on the following grounds:

COMPLAINT (No. _____) – 37

157.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 155 as though set forth herein.

158.    As set forth herein, Defendants have engaged in various acts of misconduct and specifically with respect to the payment of $2.7 million in compensation bonuses to Prestige's Management Team and 22.5% salary increases paid to Prestige's Management Team beginning on or around March 15, 2021. Defendants have prioritized increasing the compensation of the highest paid employees at the Company (besides Defendants) over ensuring that Prestige meets its obligations to the IRS, pays its debts to the federal government and its private lenders, allocates sufficient funds for capital expenditures to improve the facilities Prestige and its affiliates operate, and otherwise avoids insolvency. In addition, Defendants worked together to intentionally withhold information from their fellow Members, Plaintiffs, in order to mislead their fellow Members and evade Dr. Rick's oversight over the management of PSL. Meanwhile, Defendants have effectively abandoned their posts as Chief Executive Officer and Executive Vice President of the Company, despite collecting six-hundred thousand dollar ($600,000) salaries. Defendants have also refused efforts of Dr. Rick to hire a qualified and competent CEO and EVP to administer Prestige and to keep PCI's Directors, its Chairman, and shareholders adequately informed so they can perform their functions and otherwise protect their investments in Prestige.

159.    In order to protect and preserve the assets of PSL and the interests of its members going forward, and to ensure appropriate management and operation of PSL, Plaintiffs, derivatively on behalf of PSL, request an Order enjoining Defendants from, *inter alia*:

       a.     Causing or allowing any form of compensation to be paid to any employee, officer, director, or other agent of PSL pursuant to the $2 million in bonus compensation Defendants purported to approve on behalf of PSL on or around March 15, 2021, in addition to the 22.5% salary

COMPLAINT (No. _____) – 38

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

increases to PSL's Management Team which Defendants purported to approve on behalf of the Company on or around the same time;

b. Entering into any transactions, dealings, or agreements on behalf of PSL without consulting, in writing, with Dr. Rick, and giving Dr. Rick a reasonable opportunity to object and call a special meeting of the Members of PSL;

c. Entering into any transactions, dealings, agreements on behalf of PSL, without consulting, in writing, with Dr. Rick, and securing the unanimous written consent of the Members of PSL;

d. Taking any salary from PSL without the unanimous written consent of PSL's members;

e. Purporting to approve any short-term or long-term bonuses plans, employment agreements, stock option plan, or other forms of employee benefits without consulting Dr. Rick and securing the unanimous written consent of the Members;

f. Withholding any and all information, data, and documents necessary to the management and operations of PSL from Dr. Rick, including all relevant QuickBooks, financial and accounting data, upon written request by Dr. Rick.

160. PSL will be irreparably harmed if the foregoing relief is not immediately granted by way of an injunction as PSL's cash on hand is in danger of being imminently depleted, leaving PSL unable to meet its current liabilities, throwing PSL into insolvency and irreparably damaging PSL's credit and standing with its creditors.

161. PSL has no adequate remedy for ensuring that its cash reserves are not materially injured during and after the pendency of trial in this matter.

COMPLAINT (No. _____) – 39

**TWELFTH CAUSE OF ACTION**

**(Appointment of Receiver of Prestige Care, Inc.)**

162.    Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, individually and derivatively allege on behalf of Prestige Care Inc., an action for Appointment of Receiver against Defendants and Does 1-10 on the following grounds:

163.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 161 as though set forth herein.

164.    Unless a receiver is appointed to take over and manage the business and affairs of PCI and to preserve its property, including its available cash on hand during the pendency of this action, the interests of PCI and its shareholders will suffer in that Defendants will continue to engage in acts of misconduct designed to usurp control from the Board of Directors and the Chairman of the Board, waste the assets of the PCI, and drive PCI into insolvency, thereby devaluing the shares of common stock held by PCI's shareholders, including Plaintiffs.

165.    In accordance therewith, Plaintiff requests that during the pendency of this matter, the Court appoint a receiver to take over and manage the business affairs of PCI and specifically to ensure that PCI is operated under proper corporate governance as required by the Bylaws and Articles and consistent with Washington law.

166.    Accordingly, a receiver would serve some of the following separate functions:

      a.    Oversee monthly meetings of the Board of Directors;

      b.    Oversee all meetings of the shareholders – both annual and special;

      c.    Ensure compliance with PCI's Bylaws, Articles and applicable law;

      d.    Review and approve all agreements, contracts and transactions entered into by or on behalf of PCI;

      e.    Review and approve all wire transfers out of Company bank accounts;

COMPLAINT (No. _____) – 40

f.    Monitor and ensure all expenses incurred and expenses are reasonable, necessary, and in furtherance of PCI's business activities; Review and approve all business expense reports;

g.    Oversee the distribution of detailed financial information to PCI's shareholders; and

h.    Oversee and manage the pending legal investigations into Prestige;

i.    Ensure that no further payments are made pursuant to the illicit compensation bonuses and salary increases Defendants caused the Company to make to its Management Team beginning on or around March 15, 2021.

167.    PCI and Plaintiffs will be irreparably harmed if the foregoing relief is not immediately granted in that, as stated herein, Defendants have usurped the operation of the PCI, wasted its assets and spent its limited cash on hand, deliberately hid and withheld information from the Chairman of the Board, and continued to engage in acts of corporate misconduct to the detriment of PCI and of Plaintiffs' ownership interests.

## THIRTEENTH CAUSE OF ACTION

### (Appointment of Receiver of Prestige Senior Living, LLC.)

168.    Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC, individually and derivatively allege on behalf of PSL an action for Appointment of Receiver against Defendants and Does 1-10 on the following grounds:

169.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 167 as though set forth herein.

170.    Unless a receiver is appointed to take over and manage the business and affairs of PSL and to preserve its property, including its available cash on hand during the pendency of this action, the interests of PSL and its members will suffer in that Defendants will continue to

COMPLAINT (No. _____) – 41

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

1   engage in acts of misconduct designed to deprive Plaintiffs of any oversight of PSL, waste the
2   assets of PSL, and drive PSL into insolvency, thereby devaluing the membership interests of
3   PSL's members, including Plaintiffs.

4      171.      In accordance therewith, Plaintiff requests that during the pendency of this matter,
5   the Court appoint a receiver to take over and manage the business affairs of PSL and specifically
6   to ensure that PSL is operated under proper corporate governance consistent with Oregon law.

7      172.      Accordingly, a receiver would serve the following separate functions:

8         a.     Act as the designated Managing Member of PSL pursuant to the terms of
9                PSL's Operating Agreement;

10        b.     Oversee monthly meetings of the Members;

11        c.     Report to PSL's members;

12        d.     Ensure compliance with PSL's Operating Agreement and applicable law;

13        e.     Review and approve all agreements, contracts and transactions entered
14               into by or on behalf of PSL;

15        f.     Review and approve all wire transfers out of PSL's bank accounts;

16        g.     Monitor and ensure all expenses incurred and expenses are reasonable,
17               necessary, and in furtherance of PSL's business activities;

18        h.     Review and approve all business expense reports;

19        i.     Oversee the distribution of detailed financial information to PSL's
20               members and shareholders;

21        j.     Oversee and manage pending litigation matters involving PSL, including
22               the pending Department of Justice investigation;

23        k.     Ensure that no further payments are made pursuant to the illicit
24               compensation bonuses and salary increases Defendant caused the
25               Company to make to its Upper Management beginning on or around

26   COMPLAINT (No. _____) – 42

March 15, 2021.

173.     As set forth above, PSL and Plaintiff will be irreparably harmed if the foregoing relief is not immediately granted in that Defendants have usurped the operation of the PSL, wasted its assets and spent its limited cash on hand on reckless bonuses and pay raises to the highest paid employees, deliberately hid and withheld information from its Members, and continued to engage in acts of corporate misconduct to the detriment of PCI and of Plaintiffs' ownership interests.

## FOURTEENTH CAUSE OF ACTION

### (Judicial Dissolution of Prestige Care, Inc.)

174.     Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC allege a cause of action for Judicial Dissolution of PCI on the following grounds:

175.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 173 as though set forth herein

176.     RCW 23B.14.300 provides that a shareholder may bring a proceeding for judicial dissolution of a corporation upon a showing that "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent," or "the corporate assets are being misapplied or wasted".

177.     As set forth in detail herein, Defendants dominate PCI's Board of Directors and together form majority ownership of PCI's outstanding Common Stock. Over the last two years, Defendants have lied to Dr. Rick, intentionally withheld information from Dr. Rick, failed to follow PCI's corporate governance, ignored the legal advice of Company counsel, refused to engage with Dr. Rick, all the while draining the Company's cash on hand to issue exorbitant pay raises and salary increases to the highest paid persons at PCI (besides Defendants) in the midst of the COVID-19 pandemic, setting it up for impending insolvency, absent a cash influx from PCI's

COMPLAINT (No. _____) – 43

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

shareholders or another government bailout. In addition, Defendants have caused PCI to guaranty millions of dollars in credit lines extended to its subsidiaries based on knowingly false representations to their lenders.

178.    Judicial dissolution is necessary and appropriate for the protection of the rights of Plaintiffs.

## FIFTEENTH CAUSE OF ACTION

### (Judicial Dissolution of Prestige Senior Living, LLC)

179.    Plaintiffs Dr. Rick, in his capacity as Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and DEL-BLB, LLC alleged a cause of action for Judicial Dissolution against Defendants Does 1-10 on the following grounds:

180.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 178 as though set forth herein.

181.    ORS § 63.661(b) permits a member of a limited liability company to bring an action for judicial dissolution where the court finds that, "it is not reasonably practicable to carry on the business of the limited liability company in conformance with the articles of organization or any operating agreement."

182.    PSL is a member-managed limited liability company, with Defendant Vislocky serving as the designated Managing Member under its Operating Agreement.  Despite possessing plenary authority to "manage, operate, and control PSL," Defendant Vislocky has colluded with Defendant Delamarter and abused his authority to unreasonably favor the interests of some members of PSL—Defendants—to the detriment of Plaintiffs. Over the last two years, Defendant Vislocky has lied to Dr. Rick, intentionally withheld material information from Dr. Rick, ignored the legal advice of Company counsel, refused to engage with Dr. Rick's reasonable demand to refrain from wasting PSL's assets, all the while draining the Company's cash on hand to issue exorbitant pay raises and salary increases to the highest paid persons at PSL (besides

COMPLAINT (No. _____) – 44

1   Defendants) in the midst of the COVID-19 pandemic, draining PSL's cash on hand and setting it

2   up for impending insolvency, absent a cash influx from PSL's members or another government

3   bailout.

4        183.   Based on the foregoing, absent an amendment to PSL's Operating Agreement

5   requiring greater involvement of Dr. Rick, it is not reasonably practicable to carry on the

6   business of PSL with Defendant Vislocky serving as the Managing Member as provided by

7   PSL's Operating Agreement.

8        184.   Judicial dissolution is necessary and appropriate for the protection of the

9   membership rights of Plaintiffs.

10   **<u>REQUEST FOR RELIEF</u>**

11        WHEREFORE, Plaintiffs pray for judgment against Defendants and Does 1 through 10

12   as follows:

13   **On the First Cause of Action against Defendants and Does 1-10:**

14      1.   For past and future actual, compensatory, restitutionary, and/or incidental

15        damages in excess of $3 million dollars, subject to proof at trial;

16      2.   For reasonable attorney's fees and costs; and,

17      3.   For such other and further relief as the Court deems proper.

18   **On the Second Cause of Action against Defendants and Does 1-10:**

19      1.   For compensatory damages representing Plaintiff's pro rata distributions of in

20        excess of $3 million dollars, subject to proof at trial;

21      2.   For reasonable attorney's fees and costs; and,

22      3.   For such other and further relief as the Court deems proper.

23   **On the Third Cause of Action against Defendants and Does 1-10:**

24      1.   For past and future actual, compensatory, restitutionary, and/or incidental

25        damages in excess of $3 million, subject to proof at trial;

26   COMPLAINT (No. _____) – 45

2.      For reasonable attorney's fees and costs; and,

3.      For such other and further relief as the Court deems proper.

**On the Fourth Causes of Action against Defendants and Does 1-10:**

1.      For past and future actual, compensatory, restitutionary, and/or incidental damages in excess of $3 million, subject to proof at trial;

2.      For exemplary and punitive damages in excess of $9 million;

3.      For reasonable attorney's fees and costs; and,

4.      For such other and further relief as the Court deems proper.

**On the Fifth Cause of Action against Defendants and Does 1-10:**

1.      For compensatory damages representing Plaintiff's pro rata distributions of in excess of $3 million, subject to proof at trial;

2.      For reasonable attorney's fees and costs; and,

3.      For such other and further relief as the Court deems proper.

**On the Sixth Cause of Action against Defendants and Does 1-10:**

1.      For compensatory damages in excess of $2,500,200 subject to proof at trial;

2.      For exemplary and punitive damages in excess of $7,500,600;

3.      For such other and further relief as the Court deems proper.

**On the Seventh Cause of Action against Defendants and Does 1-10**

1.      For an accounting consistent with paragraph 138 of this Complaint;

2.      For costs of suit herein incurred; and,

3.      For such other and further relief as the Court deems proper.

**On the Eighth Cause of Action against Defendants and Does 1-10**

1.      For an accounting consistent with paragraph 144 of this Complaint;

2.      For costs of suit herein incurred; and,

3.      For such other and further relief as the Court deems proper.

COMPLAINT (No. _____) – 46

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

**On the Ninth Cause of Action against Defendants and Does 1-10:**

1.       For a declaration consistent with paragraph 149 of this Complaint.

**On the Tenth Cause of Action against Defendants and Does 1-10:**

1.       For preliminary and permanent injunctive relief consistent with paragraph 153 of this Complaint.

**On the Eleventh Cause of Action against Defendants and Does 1-10:**

1.       For preliminary and permanent injunctive relief consistent with paragraph 159 of this Complaint.

**On the Twelfth Cause of Action against Defendants and Does 1-10:**

1.       For the appointment of a Receiver over PCI for the purposes of administering and managing PCI and ensuring PCI's compliance with the terms of PCI's Bylaws and Articles as well as to perform all other functions as enumerated in paragraph 166 of this Complaint.

**On the Thirteenth Cause of Action against Defendants and Does 1-10:**

1.       For the appointment of a Receiver over PSL for the purposes of administering and managing PSL and ensuring PSL's compliance with the terms of PSL's Operating Agreement and Oregon law as well as to perform all other functions enumerated in paragraph 172 of this Complaint.

**On the Fourteenth Cause of Action against Defendants and Does 1-10:**

1.       For a decree winding up and judicially dissolving PCI;

2.       That the Court entertain such proceedings as may be necessary or proper for the involuntary winding up or dissolution of PCI, and, in that regard, making such orders for winding up and dissolving PCI as justice and equity require, including a buy-out of the shares of Common Stock Plaintiffs currently hold in PCI;

3.       For costs of suit herein incurred; and,

COMPLAINT (No. _____) – 47

1    4.      For such and other further relief as the Court may deem proper.

2    **On the Fifteenth Cause of Action against Defendants and Does 1-10:**

3    1.      For a decree winding up and judicially dissolving PSL;

4    2.      That the Court entertain such proceedings as may be necessary or proper for the

5    involuntary winding up or dissolution of PSL, and, in that regard, making such

6    orders for winding up and dissolving PSL as justice and equity require, including

7    a buy-out of the membership interests Plaintiffs currently hold in PSL;

8    3.      For costs of suit herein incurred; and,

9    4.      For such and other further relief as the Court may deem proper.

10    <u>**JURY TRIAL DEMAND**</u>

11    Plaintiff demands a trial by jury for all claims asserted in this Complaint so triable.

12

13    DATED: December 30, 2021      By: *s/ Zachary E. Davison*
      Zachary E. Davison, WSBA No. 47873

14    **PERKINS COIE LLP**
      1201 Third Avenue, Suite 4900

15    Seattle, WA 98101-3099
      Telephone: (206) 359-8000

16    Email: zdavison@perkinscoie.com

17    Christopher S. Reeder, *Pro Hac Vice Application Forthcoming*

18    Benjamin S. Tragish, *Pro Hac Vice Application Forthcoming*

19    **CSREEDER, PC**

20    11766 Wilshire Blvd., Suite 1470
      Los Angeles, CA 90025

21    Telephone: (310) 861-2470
      Email: chris@csrlawyers.com

22    Email: ben@csrlawyers.com

23    Attorneys for Plaintiffs, BRIAN RICK DELAMARTER, M.D. individually and as

24    Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, an individual, DEL-BLB LLC, a

25    California limited liability company

26

COMPLAINT (No. _____) – 48

1  **VERIFICATION**.

2      I, Brian Rick Delamarter, M.D., of full age certify that I am a named Plaintiff in this

3  action, individually and as the Trustee of the Delamarter Family Trust U/T/D/ 6/11/93, and that I

4  am the Manager and duly appointed representative of DEL-BLB LLC.

5      I have read the foregoing Complaint and know the contents thereof. The same is true of

6  my own knowledge, except as those matters stated therein stated on information and belief, and,

7  as to those matters, I believe them to be true.

8      I verify under penalty of perjury that the foregoing is true and correct.

9

10     Executed on: December 30, 2021

11

12                                         Brian Rick Delamarter, M.D.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

VERIFICATION (CASE NO.:        ) - 1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Exhibit 1



AME



# STATE of WASHINGTON    SECRETARY of STATE

**I, Ralph Munro,** Secretary of State of the State of Washington and custodian of its seal, hereby issue this

## CERTIFICATE OF AMENDMENT

to

PRESTIGE CARE, INC.

a Washington          Profit          corporation.  Articles of Amendment were filed for record in this office on the date indicated below.

Amending and Restating Articles

U.B.I. Number:    601 436 259          Date:    May 11, 1995

*Given under my hand  and the seal of the State of Washington, at Olympia, the State Capital*

*Ralph Munro, Secretary of State*

ssf 58 (5/91)                              2-467295-8

1995  3161  2303  0428-0433

Val: 04/11/1995 - 43596
$30.00 on 04/10/1995
Check - 04/10/1995 - 100810

# CERTIFICATE OF

## AMENDED AND RESTATED

## ARTICLES OF INCORPORATION

## OF

## PRESTIGE CARE, INC.

FILED
TATE OF WASHINGTOI

**MAY 1 1 1995**

RALPH MUNRO
ECRETARY OF STAT'

Pursuant to the provisions of RCW 23B.10.070 of the Washington Business Corporation Act, Prestige Care, Inc., a Washington corporation (the "Company"), hereby certifies that it has restated its articles of the incorporation:

**FIRST:** The name of the Company is:

### PRESTIGE CARE, INC.

**SECOND:** The amended and restated articles of incorporation as adopted by the shareholders of the Company supersede the Articles of Incorporation of the Company and contain amendments to the Articles of Incorporation as follows:

1. Articles I through VII of the Articles of Incorporation are amended to read in their entirety as set forth in the Amended and Restated Articles of Incorporation, attached hereto as Exhibit A.

2. The amendments provide for an exchange, reclassification or cancellation of issued shares.

**THIRD:** The foregoing amendments to the Articles of Incorporation were duly approved and adopted on December 31, 1994 by the board of directors and shareholders of the Company in accordance with the provisions of RCW 23B.10.030 and RCW 23B.10.040.

EXECUTED this 1st day of January, 1995.

PRESTIGE CARE, INC.

By: _____
Its President

70040515.1

EXHIBIT A

## AMENDED AND RESTATED

## ARTICLES OF INCORPORATION

## OF

## PRESTIGE CARE, INC.

Pursuant to the provisions of RCW 23B.10.070 of the Washington Business Corporation Act, Prestige Care, Inc., a Washington corporation, hereby restates its Articles of Incorporation as now and heretofore amended:

### ARTICLE I.

The name of the Corporation is PRESTIGE CARE, INC., and

its duration shall be perpetual.

### ARTICLE II.

The purposes for which the Corporation is organized are:

(1)   To provide health care services emphasizing long term care; and

(2)   To engage in any lawful activities for which a corporation may be organized under the Washington Business Corporation Act and successor statutes.

### ARTICLE III.

The total number of shares of all classes of stock which the Corporation shall have

authority to issue is twenty thousand shares (20,000) of common stock (hereinafter sometimes

referred to as "Common Stock").

### ARTICLE IV.

The holders of shares of Common Stock shall be entitled to receive dividends, if

and when declared by the Board of Directors, from time to time from any funds legally available

therefor.  Each outstanding share of Common Stock shall entitle the holder thereof to one vote

70040518.1

1

1995 3161 2303 0430

on each matter submitted to a vote at a meeting of the stockholders.  Shareholder shall not have the right to cumulate votes for the election of directors.

## ARTICLE V.

In furtherance and addition to, and not in limitation of, the powers conferred on directors by law, the Board of Directors is expressly authorized:

(1)     To manage the business and affairs of this Corporation and to appoint and remove all officers, agents, fiduciaries, employees, contractors, counsel, auditors and others and to fix their compensation.

(2)     To exercise all powers conferred on this Corporation and all powers necessary or proper to carry out the purposes of this Corporation which are not expressly reserved to shareholders by statute or these Articles of Incorporation and Amendments thereto.

(3)     To adopt, alter, amend or repeal the Bylaws of this Corporation, subject to repeal or change by action of the shareholders, and except as the Bylaws may otherwise provide.

(4)     To fix the compensation of Directors.

(5)     To authorize or cause to be executed mortgages, liens and encumbrances upon the real and personal property of this Corporation.

(6)     To set apart out of any of the net profits arising from the business of this Corporation a reserve or reserves for any proper purpose or to abolish any such reserve in the manner which it was created.

(7)     To fill any vacancy on the Board of Directors occurring by reason of death, removal, inability to serve or resignation of a Director, or by reason of an increase in the number of Directors, by the affirmative vote of a majority of the remaining Directors.

(8)     To provide generally or specifically for the designation of two or more Directors to constitute an Executive Committee, which committee may have and may exercise all the authority of the Board of Directors in the management of this Corporation, excepting only the authority to amend the Articles of Incorporation; adopt a plan of merger or consolidation; recommend to the shareholders the sale, lease, exchange, mortgage, pledge or other disposition of all or substantially all the property and assets of this Corporation other than in the usual course of business; recommend to the shareholders a voluntary dissolution of the Corporation or a revocation thereof; or amending the Bylaws of this Corporation.

70040518.1

2

1995 3161 2303 0431

(9)     To distribute assets of this Corporation to the shareholders in partial liquidation out of stated capital or capital surplus, in cash or property, in its discretion, if such distribution is otherwise consistent with laws of the State of Washington.

(10)    To create and issue (whether or not in connection with the issuance and sale of any of this Corporation's shares or other securities or obligations) warrants, rights, options or other obligation convertible into, exchangeable for or entitling the holder thereof to purchase form this Corporation, shares of any class or classes of stock. Such warrants, rights, options or other obligations shall be evidenced in such manner as the Board of Directors shall approve and shall set forth the terms on which, the time or times within which, and the price or prices at which such shares may be purchased from the Corporation upon the exercise of any such warrants, rights, options or other obligations shall not be less than the par value thereof. In the absence of fraud in the transaction, the judgment of the Board of Directors as to the value of the consideration received for such warrants, rights, options or other obligations or the shares underlying them shall be conclusive.

(11)    To issue authorized, but unissued, shares of this Corporation at such times, on such terms and for such type and amount of consideration, not less than the par value thereof if such shares have a par value, as the Board of Directors may determine, and the judgment of the Board of Directors as to the judgment of the consideration received shall be conclusive in the absence of fraud in the transaction.

(12)    To purchase, take, receive or otherwise acquire, hold, own, pledge, sell, transfer or otherwise assign shares, securities or other obligations of this Corporation (whether issued, unissued, or treasury shares or securities, and whether in connection with the issuance and sale of any stock, obligations or other securities of this Corporation or otherwise) at such times, on such terms, and for such consideration, whether less than the par value thereof or not, as the Board of Directors shall deem adequate.

(13)    To purchase share or other securities of this Corporation without limitation for the purpose of eliminating fractional shares, collecting or compromising indebtedness of this Corporation, paying dissenting shareholders entitled to payment for their shares under the laws of the State of Washington, the retirement of redeemable shares of this Corporation by redemption or by purchase.

## **ARTICLE VI.**

This Corporation shall have the right to purchase its own shares to the extent of unreserved and unrestricted earned surplus available therefor and to the extent of unreserved and unrestricted capital surplus available therefor.

70040518.1

3

1995 3161 2303 0432

## ARTICLE VII.

If any of these Articles shall be found, in any action, suit or proceeding, to be invalid or ineffective, the validity and effect of the remaining provisions shall not be affected.

70040518.1

4

Exhibit 2

# BYLAWS

# OF

# PRESTIGE CARE, INC.

**As Amended January 6, 2017**

# BYLAWS OF PRESTIGE CARE, INC.

## ARTICLE 1
## SHAREHOLDERS' MEETINGS

**Section 1.1**    Annual Meeting.  The annual meeting of the shareholders shall be held at one o'clock p.m. on the fourth Tuesday in January of every year at the principal office of the corporation or at such other time, date or place as may be determined by the Board of Directors. At such meeting the shareholders entitled to vote shall elect a Board of Directors and transact such other business as may come before the meeting.

**Section 1.2**    Special Meetings.  The corporation shall hold special meetings of shareholders at any time on call of the President or the Board of Directors, or on demand in writing by shareholders of record holding shares with at least 10 percent (10%) of the votes entitled to be cast on any matter proposed to be considered at the special meeting.

**Section 1.3**    Notice.  Written notice stating the place, date and time of the meeting, and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten nor more than sixty days before the date of the meeting, either personally or by mail, by or at the direction of the President or the Secretary, to each shareholder of record entitled to vote at such meeting.  If mailed, the notice shall be deemed to be delivered when deposited in the United States mail addressed to the shareholder at the shareholder's address as it appears on the current shareholder records of the corporation, with postage prepaid.

**Section 1.4**    Waiver of Notice.  A shareholder may, at any time, waive any notice required by these Bylaws, the Articles of Incorporation or the Washington Business Corporation Act.  The waiver must be in writing, be signed by the shareholder, and be delivered to the corporation for inclusion in the minutes and filing in the corporate records.  A shareholder's attendance at a meeting waives any objection to (a) lack of notice or defective notice, unless the shareholder objects at the beginning of the meeting to holding the meeting or transacting business at the meeting and (b) consideration of any matter at the meeting that is not within the purpose or purposes described in the notice of a special meeting, unless the shareholder objects to considering the matter when it is presented.

**Section 1.5**    Voting.  Except as otherwise provided in the Articles of Incorporation, each shareholder shall be entitled to one vote, in person or by proxy, on each matter voted on at a shareholder's meeting for each share of stock entitled to vote outstanding in such shareholder's name on the records of the corporation.  Shares of this corporation held by another corporation in which this corporation holds a majority of the shares entitled to vote for directors may not be voted unless the shares are held as trustee or in another fiduciary capacity.

**Section 1.6**   <u>Quorum; Vote Required</u>.   A majority of the shares entitled to vote on a matter, represented in person or by proxies, shall constitute a quorum with respect to that matter at any meeting of the shareholders.   If a quorum is present, action on a matter, other than the election of directors, is approved if the votes cast in favor of the action exceed the votes cast in opposition, unless the vote of a greater number is required by the Washington Business Corporation Act or the Articles of Incorporation.   Election of directors is governed by <u>Section 2.1</u> of these Bylaws.

**Section 1.7**   <u>Adjournment of Meeting</u>.   Unless otherwise provided in the Articles of Incorporation, a majority of votes represented at a meeting of shareholders, whether or not a quorum, may adjourn the meeting to a different time and place.   No further notice of the adjourned meeting is required if the new date, time and place is announced at the meeting prior to adjournment, and the date is one-hundred twenty (120) days or less form the date of the adjourned meeting.   At the adjourned meeting at which a quorum is present, any business may be transacted that might have been conducted at the meeting as originally called.

**Section 1.8**   <u>Action Without Meeting</u>.   Any action required or permitted to be taken at a meeting of shareholders may be taken without a meeting if a written consent, or consents, describing the action taken is signed by all of the shareholders entitled to vote on the action and delivered to the corporation for inclusion in the minutes and filing with the corporate records.   The action is effective when the last shareholder signs the consent, unless the consent specifies a later effective date.   A consent signed under this section has the effect of a meeting vote and may be described as such in any document.   Unless a record date for determining the shareholders entitled to take action without a meeting is otherwise established, the record date for that purpose is the date the first shareholder signs the consent.   If the Washington Business Corporation Act requires that notice of a proposed action be given to non-voting shareholders and the action is to be taken by unanimous consent of the shareholders, at least ten (10) days written notice of the proposed action shall be given to non-voting shareholders before the action is taken.

## ARTICLE 2
## BOARD OF DIRECTORS

**Section 2.1**   <u>Number and Election of Directors</u>.   The Board of Directors shall consist of not less than two members and not more than eleven members.   The number of directors shall be established within this range from time to time by resolution of the Board of Directors.   No decrease in the number of directors shall have the effect of shortening the term of any incumbent director.   At each annual meeting, the shareholders shall elect directors by a plurality of the votes cast by the shares entitled to vote in the election.   Directors shall be elected to hold office until the next annual meeting of shareholders and until their successors shall have been elected and qualified, subject to prior death, resignation or removal.

**Section 2.2**   Vacancies.  Unless otherwise provided in the Articles of Incorporation, any vacancy occurring in the Board of Directors, including a vacancy resulting from an increase in the number of directors, may be filled by the Board of Directors or if the remaining directors do not constitute a quorum, by the affirmative vote of a majority of the remaining directors.  A director elected to fill a vacancy shall be elected for the unexpired term of the director's predecessor in office, subject to prior death, resignation or removal.

**Section 2.3**   Annual Meeting.  There shall be an annual meeting of the Board of Directors which may be held without notice immediately after the adjournment of the annual meeting of the shareholders or at another time designated by the Board of Directors upon notice in the same manner as provided in Section 2.5.  The annual meeting shall be held at the principal office of the corporation or at such other place as the Board of Directors may designate.

**Section 2.4**   Regular Meetings.  The Board of Directors may by resolution provide for regular meetings.  Each director then in office shall be provided written notice of the scheduled date, hour and place of each regular meeting, personally delivered or mailed by United States mail, first class postage prepaid, addressed to each director at the director's address appearing on the records of the corporation, not less than seven (7) days prior to the date of the first regular meeting held after the adoption or modification of the resolution providing for regular meetings.

**Section 2.5**   Special Meetings.  Special meetings of the Board of Directors may be called by the President, the Chief Executive Officer or any member of the Board of Directors.  Each director shall be given notice of each special meeting which shall be actually delivered, orally or in writing, not less than twenty-four (24) hours prior to the meeting or mailed by deposit in the United States mail, first class postage prepaid, addressed to the director at the director's address appearing on the records of the corporation not less than seventy-two (72) hours prior to the meeting.  Special meetings of the directors may also be held at any time when all members of the Board of Directors are present and consent to a special meeting.  Special meetings of the directors shall be held at the principal office of the corporation or at any other place designated by a majority of the Board of Directors.

**Section 2.6**   Telephonic Meetings.  The Board of Directors may permit directors to participate in a meeting by any means of communication by which all of the persons participating in the meeting can hear each other at the same time.  Participation in such a meeting shall constitute presence in person at the meeting.

**Section 2.7**   Waiver of Notice.  A director may, at any time, waive any notice required by these Bylaws, the Articles of Incorporation or the Washington Business Corporation Act.  Except as otherwise provided in this Section, the waiver must be in writing, be signed by the director, must specify the meeting for which notice is waived, and be delivered to the corporation for inclusion

in the minutes and filing in the corporate records.  A director's attendance at a  meeting waives any required notice, unless the director at the beginning of the meeting or  promptly upon the director's arrival objects to holding the meeting or transacting business at the  meeting and does not thereafter vote for or assent to any action taken at the meeting.

**Section 2.8**    Quorum.  A majority of the number of directors that has been prescribed  within the range established by Section 2.1 of these Bylaws shall constitute a quorum for the  transaction of business.

**Section 2.9**    Voting.  The act of the majority of the directors present at a meeting at  which a quorum is present shall be the act of the Board of Directors, unless otherwise provided  by the Articles of Incorporation or these Bylaws.

**Section 2.10**  Action Without Meeting.  Unless otherwise provided by the Articles of Incorporation, any action required or permitted to be taken at a Board of Directors meeting may be taken without a meeting if a written consent, or consents, describing the action taken is signed by each director and included in the minutes and filed with the corporate records.  The action is effective when the last director signs the consent, unless the consent specifies a later effective date.  A consent signed under this section has the effect of a meeting vote and may be described as such in any document.

**Section 2.11**  Removal of Directors.  Unless otherwise provided by the Articles of  Incorporation, the shareholders, at any meeting of the shareholders called expressly for that  purpose, may remove any director from office, with or without cause.

**Section 2.12**  Powers of Directors.  The Board of Directors shall have sole responsibility  for the management of the business of the corporation.  In the management and control of the  property, business and affairs of the corporation, the Board of Directors is vested with all of the  powers possessed by the corporation itself, so far as this delegation of power is not inconsistent  with the Washington Business Corporation Act, the Articles of Incorporation, or these Bylaws.

The Board of Directors shall have power to determine what amount constitutes net earnings of the Corporation, what amount shall be reserved for working capital and for any other purpose,  and what amount shall be declared as dividends, and such determinations by the Board of  Directors shall be final and conclusive except as otherwise provided by the Washington Business Corporation Act and the Articles of Incorporation.  The Board of Directors shall designate one or more officers of the corporation who shall have the power to sign all deeds, leases, contracts, mortgages, deeds of trust and other instruments and documents executed by and binding upon the corporation.  In the absence of a designation of any other officer or officers, the Chief Executive Officer shall be the officer so designated.

**Section 2.13**   Committees.  Unless the Articles of Incorporation otherwise provide, a majority of the Board of Directors may designate from among its members an Executive Committee or other committees of two or more members each.  Each committee shall have such powers and shall perform such duties as may be delegated and assigned to the committee by the Board of Directors. No committee shall have the authority of the Board of Directors with reference to:

  a)     approving dividends or other distributions to shareholders, amending the Articles of Incorporation;

  b )    adopting a plan of merger;

  c )    recommending to the shareholders the sale, lease or exchange, or other disposition of all or substantially all the property and assets of the corporation otherwise than in the usual and regular course of its business;

  d )    recommending to the shareholders a voluntary dissolution of the corporation or a revocation thereof;

  e )    approving or proposing to shareholders other actions required to be approved by the shareholders;

  f )    authorizing or approving any reacquisition of shares of the corporation, except within limits prescribed by the Board of Directors;

  g )    authorizing or approving the issuance or sale or contract for sale of shares of the corporation's stock, or determining the designation and relative rights, preferences and limitations of a class or series of shares, except as authorized by the Board of Directors either pursuant to a stock option or other stock compensation plan or subject to a maximum number of shares to be issued;

  h )    amending the Bylaws of the corporation; or

  i )    taking any other action prohibited by the Washington Business Corporation Act.

The provisions of Section 2.4, Section 2.5, Section 2.6, Section 2.7, Section 2.8, Section 2.9, and Section 2.10 of the Bylaws shall also apply to all committees.  Each committee shall keep written records of its activities and proceedings.  All actions by committees shall be reported to the Board of Directors at the next meeting following the action and the Board of Directors may ratify or may

revise or alter such action, provided that no rights or acts of third  parties shall be affected by any such revision or alteration.

**Section 2.14**   Chairman of the Board. The Board of Directors may elect one of its  members Chairman of the Board of Directors.  The Chairman shall advise and consult with the  Board of Directors and the officers of the corporation as to the determination of policies of the  corporation, shall preside at all meetings of the Board of Directors and of the shareholders, and  shall perform such other functions and responsibilities as the Board of Directors shall designate  from time to time.

**Section 2.15**   Vice Chairman of the Board.  The Board of Directors may elect one of its  members Vice Chairman of the Board of Directors.  The Vice Chairman shall have all of the  powers and perform all of the duties of the Chairman during the absence or disability of the  Chairman, and shall perform such other functions and responsibilities as the Board of Directors  shall designate from time to time.

## ARTICLE 3
## OFFICERS

**Section 3.1**   Composition.  The officers of this corporation shall consist of a President,  an Executive Vice President, a Secretary and a Treasurer, each of whom shall be elected by the  Board of Directors at the annual meeting of the Board of Directors.  Such other officers and  assistant officers and agents as may be deemed necessary may be elected or appointed by or in the  manner directed by the Board of Directors, and any vacancies occurring in any office of this  corporation may be filled by election or appointment by the Board of Directors at any regular  meeting or any special meeting called for that purpose.  All officers shall hold their office until  the next annual meeting of the Board of Directors and until their successors are elected and  qualified, subject to prior death, resignation or removal.

**Section 3.2**   President. At the request of the Chairman or Vice Chairman of the Board  of Directors or in the absence of the Chairman and Vice Chairman, the President shall preside at  meetings of the Board of Directors and of the shareholders.  The President shall sign such  documents and instruments of the corporation as may be required by the Articles of  Incorporation or these Bylaws, or as may be requested by the Chief Executive Officer, and shall  perform such other duties as may be prescribed by the Board of Directors.

**Section 3.3**   Chief Operating Officer.  The Board of Directors may elect a Chief  Operating Officer of the corporation.  The Chief Operating Officer shall report to and shall be  subject to the supervision of the President and shall have general supervision over the day-to-day  operations of the business and affairs of the corporation, including the authority to hire and fire  non-officer

personnel and to take such other actions as are necessary and appropriate to implement the policies, goals and directions established by the Board of Directors, the Chief Executive Officer and the President. The Chief Operating Officer shall have all of the powers and perform all of the duties of the President during the absence or disability of the President, and shall perform such other duties as may be prescribed by the Board of Directors, the Chief Executive Officer and the President.

**Section 3.4**   Executive Vice President. The Executive Vice President shall have all of the powers and perform all of the duties of the President during the absence or disability of the President and the Chief Operating Officer, if any, and shall perform such other duties as may be prescribed by the Board of Directors. The Board of Directors may designate certain persons as Vice Presidents in charge of operational areas of the corporation's business. Any such operational Vice President shall not have authority to exercise the powers of the President during the absence or disability of the President and the Chief Operating Officer, if any, but shall have authority limited to management of the designated operational area.

**Section 3.5**   Secretary. The Secretary shall keep the minutes and records of all the meetings of the shareholders and directors and other official business of the corporation. The Secretary shall give notice of meetings to the shareholders and directors and shall perform such other duties as may be prescribed by the Board of Directors.

**Section 3.6**   Treasurer. It shall be the duty of the Treasurer to receive all moneys and funds of the corporation and to deposit the same in the name and to the account of the corporation in the bank or banks designated by the Board of Directors. The Treasurer shall keep accurate books of account and shall make reports of financial transactions of the corporation to the Board of Directors and shall perform such other duties as may be prescribed by the Board of Directors. The Treasurer shall also be the Chief Financial Officer of the corporation and may be identified by that title. If the Board of Directors elects a Vice President, Finance, the duties of the office of Treasurer may rest in that officer and in that event, the Board of Directors need not appoint a Treasurer.

**Section 3.7**   Chief Executive Officer. The Board of Directors shall designate one of the officers of the corporation or the Chairman of the Board of Directors to serve as the Chief Executive Officer of the corporation. In the absence of a designation of any other officer, the President shall also be the Chief Executive Officer. The Chief Executive Officer shall be responsible for implementing the policies and goals of the corporation as stated by the Board of Directors; shall have general supervision over the property, business and affairs of the corporation; and shall have authority to hire and fire personnel and take such other actions as are necessary and appropriate to implement the policies, goals and directions of the Board of Directors.

**Section 3.8**   <u>Removal</u>.  The directors, at any regular meeting or any special meeting called for that purpose, may remove any officer from office with or without cause; provided,  however, that no removal shall impair the contract rights, if any, of the officer removed or of this  corporation or of any other person or entity.

**ARTICLE 4**
**STOCK AND OTHER SECURITIES**

**Section 4.1**   <u>Certificates</u>.  All stock and other securities of this corporation shall be  represented by certificates which shall be signed by the President or a Vice President and the  Secretary or an Assistant Secretary of the corporation, and may be sealed with the seal of the  corporation or a facsimile thereof.

**Section 4.2**   <u>Transfer Agent and Registrar</u>.  The Board of Directors may from time to time appoint one or more Transfer Agents and one or more Registrars for the stock and other  securities of the corporation.  The signatures of the President or a Vice President and the  Secretary or an Assistant Secretary upon a certificate may be facsimiles if the certificate is  manually signed by a Transfer Agent, or registered by a Registrar, and the Transfer Agent or Registrar is neither the corporation itself nor an employee of the corporation.

**Section 4.3**   <u>Transfer</u>.  Title to a certificate and to the interest in this corporation  represented by that certificate can be transferred only:

> a)    by delivery of the certificate endorsed by the person  appearing by the certificate to be the owner of the interest represented thereby either in blank or to a specified person; or

> b)    by delivery of the certificate and a separate  document containing a written assignment of the certificate or a power of attorney to sell, assign  or transfer the same, signed by the person appearing by the certificate to be the owner of the interest represented thereby either in blank or to a specified person.

**Section 4.4**   <u>Necessity for Registration</u>.  Prior to presentment for registration upon the  transfer books of the corporation of a transfer of stock or other securities of this corporation, the corporation or its agent for purposes of registering transfers of its securities may treat the registered owner of the security as the person exclusively entitled to vote; to receive any notices; to receive payment of any interest on a security, or of any ordinary, extraordinary,  partial liquidating, final liquidating, or other dividend, or of any other distribution, whether paid in cash or in securities or in any other form; and otherwise to exercise or enjoy any or all of the rights  and powers of an owner.

**Section 4.5**   Fixing Record Date.  The Board of Directors may fix in advance a date as record date for the purpose of determining the registered owners of stock or other securities entitled to notice of or to vote at any meeting of the shareholders or any adjournment thereof; to receive payment of any interest on a security, or of any ordinary, extraordinary, partial liquidating, final liquidating, or other dividend, or of any other distribution, whether paid in cash or in securities or in any other form; to otherwise exercise or enjoy any or all of the rights and powers of an owner, or in order to make a determination of registered owners for any other proper purpose. The record date shall be not more than seventy (70) days and, in case of a meeting of shareholders, not less than ten (10) days prior to the date on which the particular action which requires such determination of registered owners is to be taken.

**Section 4.6**   Record Date for Adjourned Meeting.  A determination of shareholders entitled to notice of or to vote at a shareholders meeting is effective for any adjournment of the meeting unless the Board of Directors fixes a new record date.  A new record date must be fixed if a shareholders' meeting is adjourned to a date more than one-hundred twenty (120) days after the date fixed for the original meeting.

**Section 4.7**   Lost Certificates.  In case of the loss or destruction of a certificate of stock or other security of this corporation, a duplicate certificate may be issued in its place upon such conditions as the Board of Directors shall prescribe.

**ARTICLE 5**
**INDEMNIFICATION**

**Section 5.1**   Non-Derivative Actions.  Subject to the provisions of Section 5.3 and Section 5.6 below, the corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, (including all appeals) (other than an action by or in the right of the corporation) by reason of or arising from the fact that the person is or was a director or officer of the corporation or one of its subsidiaries, or is or was serving at the request of the corporation as a director, officer, partner, or trustee of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against reasonable expenses (including attorney's fees), judgments, fines, penalties, excise taxes assessed with respect to any employee benefit plan and amounts paid in settlement actually and reasonably incurred by the person to be indemnified in connection with such action, suit or proceeding if the person acted in good faith, did not engage in intentional misconduct, and, with respect to any criminal action or proceeding, did not know the conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in

good faith or, with respect to any criminal action or proceeding, that the person knew that the conduct was unlawful.

**Section 5.2**   Derivative Actions.  Subject to the provisions of Section 5.3 and Section 5.6 below, the corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit (including all appeals) by or in the right of the corporation to procure a judgment in its favor by reason of or arising from the fact that the person is or was a director or officer of the corporation or one of its subsidiaries, or  is or was serving at the request of the corporation as a director, officer, partner, or trustee of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against reasonable expenses (including attorneys' fees) actually incurred by the person to be indemnified in connection with the defense or settlement of such action or suit if  the person acted in good faith, provided, however, that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for deliberate misconduct in the performance of that person's duty to the corporation, for any transaction in which the person received an improper personal benefit, for any breach of the duty of loyalty to the corporation, or for any distribution to shareholders which is unlawful under the Washington Business Corporation Act, or successor statute, unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper.

**Section 5.3**   Determination of Right to Indemnification in Certain Cases.  Subject to the provisions of Sections 5.5 and 5.6 below, indemnification under Section 5.1 and Section 5.2 of this Article shall not be made by the corporation unless it is expressly determined that indemnification of the person who is or was an officer or director, or is or was serving at the request of the corporation as a director, officer, partner, or trustee of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, is proper in the circumstances because the person has met the applicable standard of conduct set forth in Section 5.1 and Section 5.2.  That determination may be made by any of the following:

> a)   by the Board of Directors by majority vote of quorum consisting of directors who are not or were not parties to the action, suit or proceeding;

> b)   if a quorum cannot be obtained under Section 5.3a, by majority vote of a committee duly designated by the Board of Directors consisting solely of two  or more directors not at the time parties to the proceeding (directors who are parties to the proceeding may participate in the designation of the committee);

> c)   by special legal counsel selected by the Board of Directors or its committee in

the manner prescribed in <u>Section 5.3a</u> or <u>Section 5.3b</u> or, if a quorum of the Board of Directors cannot be obtained under <u>Section 5.3c</u> and a committee cannot be designated under <u>Section 5.3b</u>, the special legal counsel shall be selected by majority vote of the full Board of Directors, including directors who are parties to the proceeding;

d)    by the shareholders; or

e)    by a court of competent jurisdiction.

**Section 5.4**    <u>Indemnification of Persons Other than Officers or Directors</u>.  Subject to the provisions of <u>Section 5.6</u>, in the event any person not entitled to indemnification under <u>Section 5.1</u> and <u>Section 5.2</u> of this Article was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding of a type referred to in <u>Section 5.1</u> and <u>Section 5.2</u> of this Article by reason of or arising from the fact that such person is or was an employee or agent (including an attorney) of the corporation or one of its subsidiaries, or is or was serving at the request of the corporation as an employee or agent (including an attorney) of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, the Board of Directors of the corporation by a majority vote of a quorum (whether or not such quorum consists in whole or in part of directors who were parties to such action, suit or proceeding) or the stockholders of the corporation by a majority vote of the outstanding shares may, but shall not be required to, grant to such person a right of indemnification to the extent described in <u>Section 5.1</u> and <u>Section 5.2</u> of this Article as if the person were acting in a capacity referred to therein, provided that such person meets the applicable standard of conduct set forth in such Sections.  Furthermore, the Board of Directors may designate by resolution in advance of any action, suit or proceeding, those employees or agents (including attorneys) who shall have all rights of indemnification granted under <u>Section 5.1</u> and <u>Section 5.2</u> of this Article.

**Section 5.5**    <u>Successful Defense</u>.  Notwithstanding any other provision of <u>Section 5.1</u>, <u>Section 5.2</u>, <u>Section 5.3</u> or <u>Section 5.4</u> of this Article, but subject to the provisions of <u>Section 5.6</u>, to the extent a director, officer, employee or agent (including an attorney) is successful on the merits or otherwise in defense of any action, suit or proceeding referred to in <u>Section 5.1</u>, <u>Section 5.2</u> or <u>Section 5.4</u> of this Article, or in defense of any claim, issue or matter therein, that person shall be indemnified against expenses (including attorneys fees) actually and reasonably incurred by him in connection therewith.

**Section 5.6**    <u>Condition Precedent to Indemnification Under Section 5.1, Section 5.2 or Section 5.4</u>.  Any person who desires to receive the benefits otherwise conferred by <u>Section 5.1</u>, <u>Section 5.2</u> or <u>Section 5.4</u> of this Article shall promptly notify the corporation that the person has been

named a defendant to an action, suit or proceeding of a type referred to in Section 5.1, Section 5.2 or Section 5.4 and intends to rely upon the right of indemnification described in Section 5.1, Section 5.2 or Section 5.4 of this Article.  The notice  shall be in writing and mailed, via registered or certified mail, return receipt requested, to the  President of the corporation at the executive offices of the corporation or, in the event the notice is from the President, to the registered agent of the corporation.  Failure to give the notice  required hereby shall entitle the Board of Directors of the corporation by a majority vote of a  quorum (consisting of directors who, insofar as indemnity of officers or directors is concerned,  were not parties to such action, suit or proceeding, but who, insofar as indemnity of employees    or agents is concerned, may or may not have been parties) or the stockholders of the corporation  by a majority of the votes entitled to be cast by holders of shares of the corporation's stock which  have unlimited voting rights of the corporation to make a determination that such a failure was  prejudicial to the corporation in the circumstances and that, therefore, the right to    indemnification referred to in Section 5.1, Section 5.2 or Section 5.4 of this Article shall be denied in its entirety  or reduced in amount.

**Section 5.7**    Advances for Expenses.  Expenses incurred by a person indemnified  hereunder in defending a civil, criminal, administrative or investigative action, suit or proceeding  (including all appeals) or threat thereof, may be paid by the corporation in advance of the final  disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of  such person to repay such expenses if it shall ultimately be determined that the person is not  entitled to be indemnified by the corporation and a written affirmation of the person's good faith  belief that he or she has met the applicable standard of conduct.  The undertaking must be a  general personal obligation of the party receiving the advances but need not be secured and may  be accepted without reference to financial ability to make repayment.

**Section 5.8**    Insurance.  The corporation may purchase and maintain insurance on  behalf of any person who is or was a director, officer, employee or agent of the corporation or one  of its subsidiaries or is or was serving at the request of the corporation as a director, officer,  partner, trustee, employee or agent of another foreign or domestic corporation, partnership, joint  venture, trust, employee benefit plan or other enterprise against any liability asserted against and  incurred by that person in any such capacity, or arising out of his status as such, whether or not  the corporation would have the power to indemnify that person against such liability under the  provisions of this Article or under the Washington Business Corporation Act.

**Section 5.9**    Purpose and Exclusivity.  The indemnification referred to in the various  Sections of this Article shall be deemed to be in addition to and not in lieu of any other rights to  which those indemnified may be entitled under any statute, rule of law or equity, agreement, vote  of the stockholders or Board of Directors or otherwise.  The corporation is authorized to enter into  agreements of indemnification.  The purpose of this Article is to augment the provisions of the  Washington Business Corporation Act dealing with indemnification.

**Section 5.10**  <u>Severability</u>.  If any of the provisions of this Article are found, in any action, suit or proceeding, to be invalid or ineffective, the validity and the effect of the remaining provisions shall not be affected.

**ARTICLE 6**
**CORPORATE SEAL**

If this corporation has a corporate seal, its size and style is shown by the impression on the margin hereof.

**ARTICLE 7**
**REIMBURSEMENT OF CERTAIN PAYMENTS**

Any payments made to an officer or director of this corporation, including payments made as salary, commission, bonus, interest, rent or for expenses incurred for travel or entertainment by that person, which are disallowed in whole or in part as a deductible expense by the Internal Revenue Service shall be reimbursed by such officer or director to this corporation to the full extent of such disallowance.  It shall be the duty of the Board of Directors to enforce collection from the officer or director of each amount disallowed.  If the Board of Directors shall determine it necessary or desirable, amounts may be withheld from the future compensation payments of an officer or director sufficient to equal the amount of any disallowed payments made to that person, in lieu of reimbursement of such amounts.

**ARTICLE 8**
**AMENDMENTS**

Unless otherwise provided in the Articles of Incorporation, the Bylaws of this corporation may be amended or repealed by the directors, subject to amendment or repeal by action of the shareholders, at any regular meeting or at any special meeting called for that purpose, provided notice of the proposed change is given in the notice of the meeting or notice thereof is waived in writing.

**ARTICLE 9**
**SEVERABILITY**

If any provision of these Bylaws is found, in any action, suit or proceeding, to be invalid or ineffective, the validity and the effect of the remaining provisions shall not be affected.

As amended January 6, 2017.

# Exhibit 3

DEC. 30. 1996 12:37PM                                              NO. 1413   P. 2
2/03/95 18:35.20   FROM: CORPORATION DIVISION   TO: 5032539850      40   PAGE  :

Submit the original
and one true copy
$40.00



Corporation Division - Business Registry
Public Service Building
255 Capitol Street NE, Suite 151
Salem, OR  97310-1327
(503) 986-2200  Facsimile (503) 378-4381

THIS SPACE FOR OFFICE USE ONLY

Registry Number:

55138987

**FILED**

DEC 3 1 1996

SECRETARY OF STATE

# ARTICLES OF ORGANIZATION
## Limited Liability Company
### PLEASE TYPE OR PRINT LEGIBLY IN BLACK INK

**ARTICLE 1:**   Name of the company:   Prestige Senior Living, L.L.C.

Note: This name must contain the words "Limited Liability Company" or the abbreviation "L.L.C."

SIC Code:   6500   (see back of this form)

**ARTICLE 2:**   ☑ Latest date upon which the Limited Liability Company is to dissolve is 12/31/21
(Check one)
                ☐   OR   Duration shall be perpetual.

**ARTICLE 3:**   Name of the initial registered agent:   FP65 Registry Services, Inc.

Address of initial registered office (must be a street address in Oregon.)

101 S.W. Main Street, 15th Floor, Portland      Oregon   97204
Street and number                               City              Zip code

**ARTICLE 4:**   Address where the Division may mail notices if
different than registered agent's address:      Attn: Corporate Counsel

6623 N.E. 82nd Avenue, Portland, OR  97220
Street and number or PO box          City        State    Zip code

**ARTICLE 5:**   Name and address of each organizer:

Bradley Zuke                    6623 NE 82nd Ave., Portland, OR  97220

Steven C. Fogg                  6623 NE 82nd Ave., Portland, OR  97220

**ARTICLE 6:**   Check the following statement if applicable:

☐   This limited liability company will be managed by a manager(s).

**ARTICLE 7:**   Optional provisions:   (attach a separate sheet if necessary)

**Execution:**

_____   Bradley Zuke            Organizer
Signature                 Printed name             Title

_____   Steven C. Fogg          Organizer
Signature                 Printed name             Title

Person to contact about this filing:   Bradley Zuke   503/253-9650
                                        Name           Daytime phone number

MAKE CHECKS PAYABLE TO THE _____ _____ _____ _____ VISA OR MASTERCARD NUMBER AND
EXPIRATION DATE _____ _____ _____ IT THE COMPLETED FORM AND FEE TO
THE ABOVE ADD _____ _____ _____ _____ _____ _____ (503) 378-4381.

201 (1/94)

PRESTIGE SENIOR LIVING, L.L.C.

55138987-1486893      NEW

Exhibit 4

# SECOND AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# PRESTIGE SENIOR LIVING, L.L.C.

**by and among**

**Mr. Harold G. Delamarter,**
**Dr. Rick Delamarter,**
**and**
**Mr. Gregory J. Vislocky**

**SECOND AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**PRESTIGE SENIOR LIVING, L.L.C.**

This Second Amended and Restated Operating Agreement (the "Agreement") is made and entered into as of September 1, 2014, by and among Mr. Harold G. Delamarter, Dr. Rick Delamarter, and Mr. Gregory J. Vislocky (referred to herein collectively as the "Members"). The Members have previously entered into an Amended and Restated Operating Agreement dated December 31, 1996, Amendment #1 to the Operating Agreement, dated as of June 11, 1998, and a Second Amendment to Amended and Restated Operating Agreement dated effective January 1, 2000,(as amended to date, the "A&R Agreement"). Subsequent to the A&R Agreement, there have been changes in the individuals who are Members of the Company and in the Manager. The current Members desire to further amend and restate the A&R Agreement solely to reflect those changes which are not currently reflected in the A&R Agreement.

The parties hereto agree to amend and restate the A&R Agreement in its entirety to read as follows:

1. **Definitions.** The following terms used in the Agreement shall have the meanings specified below:

    1.1 "Act" means the Oregon Limited Liability Company Act, as amended from time to time.

    1.2 "Agreement" means this Operating Agreement of Prestige Senior Living, L.L.C. as it may be amended from time to time.

    1.3 "Assignee" means a person who has acquired a Member's Interest in whole or part and has not become a Substitute Member.

    1.4 "Capital Account" means the account maintained for each Member in accordance with Section 7.5. In the case of a transfer of an interest, the transferee shall succeed to the Capital Account of the transferor or, in the case of a partial transfer, a proportionate share thereof.

    1.5 "Capital Contribution" means the total amount of money and the fair market value of all assets contributed to the Company by each Member pursuant to the terms of the Agreement. Capital Contribution shall also include any amounts paid directly by a Member to any creditor of the Company in respect of any guarantee or similar obligation undertaken by such Member in connection with the Company's operations. Any reference to the capital contribution of a Member shall include the capital contribution made by a predecessor holder of the interest of such Member.

    1.6 "Cash Available from Operations" means all cash receipts of the Company (other than Capital Contributions or proceeds available upon liquidation) in excess of amounts reasonably required for payment of operating expenses, repayment of current liabilities and the establishment of and additions to the cash reserves established by the manager for the operation

Page 1 – SECOND AMENDED AND RESTATED OPERATING AGREEMENT; Prestige Senior Living, L.L.C.

of the business, including, but not limited to, reserves for contingent or unforeseen liabilities or obligations of the Company.

1.7    "Code" means the United States Internal Revenue Code of 1986, as amended. References to specific Code Sections or Treasury Regulations shall be deemed to refer to such Code Sections or Treasury Regulations as they may be amended from time to time or to any successor Code Sections or Treasury Regulations if the Code Section or Treasury Regulation referred to is repealed.

1.8    "Company" means Prestige Senior Living, L.L.C. created and governed by the Agreement, and referred to hereinafter as "PSL."

1.9    "Company Property" means all the real and personal property owned by the Company, including the rights contained in Professional Services, Development, and Management Agreements.

1.10    "Deemed Capital Account" means a Member's Capital Account, as calculated from time to time, adjusted by (i) adding thereto the sum of (A) the amount of such Member's Mandatory Obligation, if any and (B) each Member's share of Minimum Gain (determined after any decreases therein for such year) and (ii) subtracting therefrom (A) allocations of losses and deductions which are reasonably expected to be made as of the end of the taxable year to the Members pursuant Code Section 704(e)(2), Code Section 706(d) and Treasury Regulation Section 1.751-1 (b)(2)(ii), and (B) distributions which at the end of the taxable year are reasonably expected to be made to the Member to the extent that said distributions exceed offsetting increases to the Member's Capital Account (including allocations of the Qualified Income Offset pursuant to Section 8.5 but excluding allocations of Minimum Gain Chargeback pursuant to Section 8.4) that are reasonably expected to occur during (or prior to) the taxable years in which such distributions are reasonably expected to be made.

1.11    "Interest" or "Company Interest" means the ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which such Member may be entitled as provided in the Agreement and in the Act, together with the obligations of such Member to comply with all the terms and provisions of the Agreement and the Act.

1.12    "Manager(s)" means those Members who are appointed in accordance with this Agreement to exercise the authority of Manager under this Agreement and the Act No person may be appointed a Manager of the Company that is not also a Member of the Company owning at least one percent (1%) Percentage Interest If at any time a Member who is a Manager ceases to be a Member for any reason, or ceases to own at least one percent (1%) Percentage Interest, that Member shall simultaneously cease to be a Manager.  The Manager of the Company on the date of this Agreement is Gregory J. Vislocky.

1.13    "Mandatory Obligation" means the sum of (i) the amount of a Member's remaining contribution obligation (including the amount of any Capital Account deficit such Member is obligated to restore upon liquidation) provided that such contribution must be made in all events within ninety (90) days of liquidation of the Member's interest as determined under

Treasury Regulation Section 1.704-1 (b)(2)(ii)(g) and (ii) such Member's share of recourse debt of the Company.

1.14    ''Member(s)'' means those persons who execute a counterpart of this Agreement and those persons who are hereafter admitted as Members under Section 14.4 below.

1.15    "Minimum Gain" means the amount determined by computing, with respect to each nonrecourse liability of the Company, the amount of gain, if any, that would be realized by the Company if it disposed of the Company Property subject to such nonrecourse liability in full satisfaction thereof in a taxable transaction, and then by aggregating the amounts so determined. Such gain shall be determined in accordance with Treasury Regulation Section 1.704-2(d). Each Member's share of Minimum Gain at the end of any taxable year of the Company shall be determined in accordance with Treasury Regulation Section 1.704-2(g)(l).

1.16    "Net Income" or "Net Loss" means taxable income or loss (including items requiring separate computation under Section 702 of the Code) of the Company as determined using the method of accounting chosen by the Manager and used by the Company for federal income tax purposes.

1.17    "Percentage Interest" means the percentage interest of each Member as set forth in Section 7.1.

1.18    "Services" means the business transacted under a network of long term care providers.

1.19    "Substitute Member" means an Assignee who has been admitted to all of the rights of Membership pursuant to Section 14.4 below.

1.20    "Voting Interest" means weight given to the vote of each Member at Member Meetings. Each Member will have one vote of equal weight with all other Members' votes, regardless of Percentage Interest.

2.    **Formation.**   The Members hereby agree to form and operate the Company under the terms and conditions set forth herein. Except as otherwise provided herein, the rights and liabilities of the Members shall be governed by the Act.

2.1    <u>Defects as to Formalities</u>. A failure to observe any formalities or requirements of this "Agreement, the articles of organization for the Company or the Act shall not be grounds for imposing personal liability on the Members or Manager for liabilities of the Company.

2.2    <u>No Partnership Intended for Nontax Purposes</u>. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Oregon Uniform Partnership law or the Oregon Uniform Limited Partnership Act or a corporation under the Oregon Business Corporation Act The Members do not intend to be partners one to another, or partners as to any third party. The Members hereto agree and acknowledge that the Company is to be treated as a partnership for federal and Oregon income tax purposes.

2.3     Rights of Creditors and Third Parties.  This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their successors and assigns.  The Agreement is expressly not intended for the benefit of any creditor of the Company or any other person.  Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Contribution or otherwise.

2.4     Title to Property.  All Company Property shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in the Member's individual name or right, and each Member's interest in the Company shall be personal property for all purposes.  Except as otherwise provided in this Agreement, the Company shall hold all Company Property in the name of the Company and not in the name or names of any Member or Members.

2.5     Payments of Individual Obligations.  The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of any Member unless otherwise provided for herein.

3.     **Name.**  The name of the Company shall be Prestige Senior Living, L.L.C.  The Manager may from time to time change the name of the Company or adopt such trade or fictitious names as it may determine to be appropriate.

4.     **Office:  Agent for Service of Process.**  The principal office of the Company is at 7700 NE Parkway Drive, Suite 300, Vancouver, WA 98662.  The Company may maintain such other offices at such other places as the Manager may determine to be appropriate.  The agent for service of process for the Company is LPSL Corporate Services, Inc., at 601 SW Second Avenue, Suite 2100, Portland, Oregon 97204.

5.     **Purposes.**  The primary purpose and general character of the business, of the Company is to provide the Services to the health care industry.  In addition, the Company may engage in any other business and shall have such other purposes as may be necessary, incidental or convenient to carry on the Company's primary purpose, or as may be mutually agreed upon by the Members.

6.     **Term.**  The term of the Company shall commence on the date of the filing of the Articles of Organization for the Company in the office of the Oregon Secretary of State, and shall continue for a period of twenty five (25) years from such date, unless sooner dissolved, wound up and terminated in accordance with the provisions of this Agreement and the Act.

7.     **Percentage Interests and Capital Contributions.**

7.1     Capital Contributions: Percentage Interests.  The Members have contributed cash or property in exchange for the following Percentage Interests in the Company:

| Name | Percentage Interest |
|------|--------------------|
| Mr. Harold G. Delamarter | 28.33% |
| Dr. Rick Delamarter | 41.67% |
| Mr. Gregory J. Vislocky | 30.00% |
| Total | 100% |

7.2     No Interest on Capital.  No Member shall be entitled to receive interest on such Member's Capital Contributions or such Member's Capital Account.

7.3     No Withdrawal of Capital.  Except as otherwise provided in this Agreement, no Member shall have the right to withdraw or demand a return of any or all of such Member's Capital Contribution.  It is the intent of the Members that no distribution (or any part of any distribution) made to any Member pursuant to Section 10 hereof shall be deemed a return or withdrawal of Capital Contributions, even if such distribution represents (in full or in part) a distribution of revenue offset by depreciation or any other non-cash item accounted for as an expense, loss or deduction from, or offset to, the Company's income, and that no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company.  However, if any court of competent jurisdiction holds that, notwithstanding the provisions of the Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of any other Member, including the Manager.

7.4     Additional Capital

(a)     Except as otherwise provided for herein or mutually agreed upon by the Member, no Member shall be obligated to make an additional capital contribution to the Company.

(b)     In the event the Manager determines that additional capital is needed for Company purposes, the Manager shall deliver a notice to each Member which sets forth the amount of the required additional capital contributions.  Any such demand shall be made in proportion to each Member's Percentage Interest, and unless extended by the Manager,_ shall be due thirty days after the date of the written demand from the Manager.  In the event a Member fails to contribute such Member's proportionate share of the requested capital contribution, the contributing Members shall have the right (i) to withdraw their contributions, or (ii) to treat their contributions, plus any funds contributed in place of the non-contributing Member, as "Dilution Contributions".  In the event Dilution Contributions are made, the Percentage Interests of the Members shall be adjusted as of the date the Dilution Contributions are made so that each Member's Percentage Interest corresponds to a fraction, the numerator of which is the sum of that Member's Adjusted Contribution Amount, plus all additional contributions made by such Member pursuant to this Section 7.4 (including Dilution Contributions), and the denominator of which is the sum of all Members' Adjusted Contributions Amount and all additional contributions made pursuant to this Section 7.4 (including Dilution Contributions).

Page 5 – SECOND AMENDED AND RESTATED OPERATING AGREEMENT; Prestige Senior Living, L.L.C.
017180.0075/6111163.2

(c)     The Manager or an affiliate may elect to lend funds to the Company for Company purposes.  Such Manager or affiliate loans shall be made on commercially reasonable terms and conditions, and the Members agree that such loans shall initially bear interest at a rate equal to the then existing Prime Rate plus two percent per annum, and shall be adjusted prospectively thereafter as of the first day of each calendar month.  For purposes of the preceding sentence, the "Prime Rate" shall equal the rate published from time to time as the prime rate in the Money Rates section of The Wall Street Journal.  Such loans shall be an obligation of the Company and shall be repaid prior to any distributions to the Members.

7.5     Capital Accounts.  The Company shall establish and maintain a Capital Account for each Member in accordance with Treasury Regulations issued under Code Section 704.  The initial Capital Account balance for each Member shall be the amount of initial Capital Contributions made by each Member under Section 7.1 above.  The Capital Account of each Member shall be increased to reflect (i) such Member's cash contributions, (ii) the fair market value of property contributed by such Member (net of liabilities securing such contributed property that the Company is considered to assume or take subject to under Code Section 752), (iii) such Member's share of Net Income (including all gain as calculated pursuant to Section 1001 of the code) of the Company and (iv) such Member's share of income and gain exempt from tax.  The Capital Account of each Member shall be reduced to reflect (a) the amount of money and the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to under Section 752), (b) such Member's share of non-capitalized expenditures not deductible by the Company in computing its taxable income as determined under Code Section 705(a)(2)(B), (c) such Member's share of Net Loss of the Company and (d) such Member's share of amounts paid or incurred to organize the Company or to promote the sale of Company Interests to the extent that an election under Code Section 709(b) has not properly been made for such amounts. The Manager shall determine the fair market value of all property which is distributed in kind, and the Capital Accounts of the Members shall be adjusted as though the property had been sold for its fair market value and the gain or loss attributable to such sale allocated among the Members in accordance with Section 8 or Section 16.3, as applicable.   In the event of a contribution of property with a fair market value which is not equal to its adjusted basis (as determined for federal income tax purposes) or a reevaluation of the Members' Capital Accounts upon the admission of new partners to the Company, the Company shall maintain separate "tax" and "book" Capital Accounts in accordance with the rules prescribed in Treasury Regulations promulgated under Code Section 704.

7.6     Default.  In the event any Member shall fail to contribute any cash or property when due hereunder, such Member shall remain liable therefor to the Company, which may institute proceedings in any court of competent jurisdiction in connection with such Member shall pay the costs of such collection, including reasonable attorneys' fees.   Any compromise or settlement with a Member failing to contribute cash or property due hereunder may be approved by a majority by Percentage Interest of the other Members.

8.     Allocations.

8.1     Allocation of Net Loss from Operations.  Except as otherwise provided in this Section 8 and in Section 16.3, the Company shall allocate Net Loss to the Members as follows:

(a)     First, to those Members having positive Capital Account balances in proportion to such positive balances until they are reduced to zero;

(b)     Second, among the Members in proportion to their personal liability on Company indebtedness until the negative Capital Account of each Member equals that Member's share of such liability; and

(c)     Thereafter, among the Members in proportion to their Percentage Interests.

8.2     Allocation of Net Income from Operations.  Except as otherwise provided in this . Section 8 and Section 16.3, the Company shall allocate all Net Income to the Members as follows:

(a)     First, to those Members having negative Capital Account balances in proportion to such negative balances until they are increased to zero; and

(b)     Thereafter, any remaining Net Income shall be allocated to the Members in proportion to their Percentage Interests.

8.3     Limitation on Net Loss Allocations.  Notwithstanding anything contained in this Section 8, no Member shall be allocated Net Loss to the extent such allocation would cause a negative balance in such Member's Deemed Capital Account as of the end of the taxable year to which such allocation relates.

8.4     Minimum Gain Chargeback.  If there is a net decrease in Minimum Gain during a taxable year of the Company, then notwithstanding any other provision of this Section 8, all Members with deficit Deemed Capital Account balances at the end of such year shall be allocated the Minimum Gain Chargeback (as defined below) for such year (and succeeding taxable years to the extent necessary) in such amounts and proportions as is needed to eliminate such deficits as quickly as possible.  The Minimum Gain Chargeback shall consist (i) first of gains recognized from the disposition of such items of property, and (ii) then a pro rata portion of the Company's other items of gross income and gain for that year.

8.5     Qualified Income Offset.  If at the end of any taxable year and after operation of Section 8.4, any Member shall have a negative balance in such Member's Deemed Capital Account, then notwithstanding anything contained in this Section 8, there shall be reallocated to each Member with a negative balance in such Member's Deemed Capital Account (determined after the allocation of income, gain or loss under this Section 8 for such year) each item of Company gross income (unreduced by any deductions) and gain in proportion to such negative balances until the Deemed Capital Account for each such Member is increased to zero.

8.6     Modification of Company Allocations.  It is the intent of the Members that each Member's distributive share of income, gain, loss, deduction, or credit (or items thereof) shall be determined and allocated in accordance with this Section 8 to the fullest extent permitted by Section 704(b) of the Code.  In order to preserve and protect the determinations and allocations provided for in this Section 8. the Manager shall be, and hereby is, authorized and directed to allocate income, gain, loss, deduction or credit (or items thereof) arising in any year different from the manner otherwise provided for in this Section 8 if, and to the extent that, allocation of

Page 7 – SECOND AMENDED AND RESTATED OPERATING AGREEMENT; Prestige Senior Living, L.L.C.
017180.0075/6111163.2

income, gain, loss, deduction or credit (or items thereof) in the manner provided for in this Section 8 would cause the termination and allocation of each Member's distributive share of income, gain, loss, deduction or credit (or items thereof), not to be permitted by Section 704(b) of the Code and Treasury Regulations promulgated thereunder. Any allocation made pursuant to this Section 8.6 shall be made only after the Manager has secured an opinion of counsel that such modification is necessary. The Members shall be given notice of the modification within thirty days of the effective date thereof, such notice to include the text of the modification and a statement of the circumstances requiring the modification to be made.

8.7     <u>Deficit Capital Accounts at Liquidation</u>. It is understood and agreed that one purpose of the provisions of this Section 8 is to avoid Members having a deficit Capital Account balance after liquidation. The Members and the Company neither intend nor expect that any Member will have a deficit Capital Account balance after liquidation and, notwithstanding anything to the contrary in this Agreement, the provisions of this Agreement shall be construed and interpreted to give effect to such intention. However, if following a liquidation of a Member's interest as determined under Treasury Regulation Section 1.704-1(b)2(ii)(g), a Member has a deficit balance in such Member's Capital Account after the allocation of Net Income pursuant to this Section 8 and Section 16.3 and all other adjustments have been made to such Member's Capital Account for Company operations and liquidation, no Member shall have any obligation to restore such a deficit balance.

9.     **Company Expenses.** The Company shall pay, and the Manager shall be reimbursed for, all costs and expenses of the Company, which may include, but are not limited to:

(a)     All organizational expenses incurred in the formation of the Company and the selling of interests in the Company;

(b)     All costs of personnel employed by the Company;

(c)     All costs reasonably related to the conduct of the Company's day-to-day business affairs, including, but without limitation, the cost of supplies and materials, travel, and services contracted for third parties;

(d)     All costs of borrowed money, taxes and assessments on Company property, and other taxes applicable to the Company;

(e)     Legal, audit, accounting, brokerage and other fees;

(f)     Printing and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of an interest in the Company or in connection with the business of the Company;

(g)     The cost of insurance obtained in connection with the business of the Company;

(h)     Expenses of revising, amending, converting, modifying or terminating the Company;

(i)     Expenses in connection with distributions made by the Company to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Members;

(j)     Expenses in connection with preparing and mailing reports required to be furnished to Members for investment, tax reporting or other purposes that the Manager deems appropriate;

(k)     Costs incurred in connection with any litigation, including any examinations or audits by regulatory agencies; and

(l)     Costs of preparation and dissemination of information material and documentation relating to potential sale, refinancing or other disposition of Company properties.

10.     **Distributions of Cash Available for Distribution.**  At such times as the Manager in its discretion determines appropriate, Cash Available for Distribution shall be distributed among the Members in proportion to their Percentage Interests.

11.     **Powers, Rights and Obligations of Manager.**

11.1    <u>General Authority and Powers of Manager</u>.  Except as provided in Section 11.7, the Manager shall have the exclusive right and power to manage, operate and control the Company and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the Company.  The authority of the Manager shall include, but shall not be limited to the following:

(a)     To spend the capital and revenues of the Company;

(b)     To lease, improve, and operate of any Company properties, including to act on behalf of the Company with respect to any partnership or joint venture in which the Company participates;

(c)     To employ persons, firms and/or corporations for the operation and management of the Company's business and for the operation of the Company, including but not limited to sales agents, management agents, attorneys and accountants;

(d)     To acquire, lease and sell personal property, hire and fire employees, and to do all other acts necessary, appropriate or helpful for the operation of the Company business;

(e)     To execute, acknowledge and deliver any and all instruments to effectuate any of the foregoing powers and any other powers granted the Manager under the laws of the state of Oregon or other provisions of this Agreement;

(f)     To enter into and to execute agreements for employment or services, as well as any other agreements and all other instruments the Manager deems necessary or appropriate to operate the Company's business or to effectively and properly perform its duties or exercise its powers hereunder;

(g)     To borrow money on a secured or unsecured basis from individuals, banks and other lending institutions to finance or refinance Company assets, to meet other Company obligations, provide Company working capital and for any other Company purpose, and to execute promissory notes, assignments of Company property, and such other security instruments as a lender of funds may require, to secure repayment of such borrowings; provided, that no individual, bank or other lending institution to which the Manager applies for a loan shall be required to inquire as to the purpose for which such loan is sought, and as between the Company and such individual, bank or other lending institution, it shall be conclusively presumed that the proceeds of such loan are to be, and will be, used for purposes authorized under the terms of this Agreement;

(h)     To enter into such agreements and contracts and to give such receipts, releases and discharges, with respect to the business of the Company, as the Manager deems advisable or appropriate;

(i)     To purchase, at the expense of the Company, such liability and other insurance as the Manager, in its sole discretion, deems advisable to protect the Company's assets and business; however, the Manager shall not be liable to the Company or other Members for failure to purchase any insurance; and

(j)     To sue and be sued, complain, defend, settle and/or compromise, with respect to any claim in favor of or against the Company, in the name and on behalf of the Company.

11.2    Time Devoted to Company: Other Ventures.  The Manager shall devote so much of its time to the business of the Company as in its judgment the conduct of the Company's business reasonably requires.  The Manager and the other Members may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Company, and shall have no obligation to disclose business opportunities available to them, and neither the Company nor any of the other Members shall have any rights in and to such independent ventures and activities or the income or profits derived therefrom by reason of their acquisition of interests in the Company.  This Section 11.2 is intended to modify any provisions or obligations of the Act to the contrary and each of the Members and the Company hereby waives and releases any claims they may have under the Act with respect to any such activities or ventures of the Manager or other Members.

11.3    Liability of Manager to Members and Company.  In carrying out its duties and exercising the powers hereunder, the Manager shall exercise reasonable skill, care and business judgment.  A Manager shall not be liable to the Company or the Members for any act or omission performed or omitted by it in good faith pursuant to the authority granted to it by this Agreement as a Manager to Tax Matters Partner (as defined in the Code) unless such act or omission constitutes gross negligence or willful misconduct by such Manager.

11.4    Indemnification.  The Company shall indemnify and hold harmless the Manager from any loss or damage, including attorneys' fees actually and reasonably incurred by it, by reason of any act or omission performed or omitted by them on behalf of the Company or in furtherance of the Company's interests or as Tax Matters Partner; however, such indemnification or agreement to hold harmless shall be recoverable only out of the assets of the Company and not

from the Members.  The foregoing indemnity shall extend only to acts or omissions performed or omitted by a Manager in good faith and in the belief that the acts or omissions were in the Company's interest or not opposed to the best interests of the Company.

11.5   <u>Fiduciary Responsibility</u>.  The Manager shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, and all such funds and assets shall be used in accordance with the terms of the Agreement.

11.6   <u>Officers</u>.  The Company may appoint officers to act as agents on its behalf to, among other things, negotiate contractual obligations including debts, expenditures, and acquisitions; sign documents; and represent The Company.  These Officers may include a President, Vice President, Secretary, Treasurer, and any other offices The Company may deem appropriate.

11.7   <u>Restrictions on Authority of Manager</u>.  The following Company decisions shall require the written consent of Members holding a majority of the Voting Interests in the Company:

> (i)      The dissolution and winding up of the Company;

> (ii)     The sale, exchange or other transfer of all or substantially all the assets of the Company other than in the ordinary course of business;

> (iii)    A change in the nature of the business of the Company;

> (iv)    Approval of the withdrawal of a Manager in accordance with Section 15.1;

> (v)     Removal of a Manager in accordance with Section 15.3;

> (vi)    Appointment of a new Manager in accordance with Section 15.4; and

> (vii)   Continuation of the Company in accordance with Section 16.1 (e).

11.8   <u>Member Meetings</u>.  Meetings of the Members may be called by any Manager or by any Member or Members holding at least 1% of the Percentage Interests.

(a)      The Manager may designate any place, either within or outside of Oregon, as the location for any meeting of the Members.  If no designation is made, or if a special meeting be called otherwise, the place of meeting shall be the principal office of the Company.

(b)      Except as provided in paragraph (c) below, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) days nor more than fifty (50) days before the date of the meeting either personally or by mail, by or at the direction of the person calling the meeting, to each Member.  If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the Member at the Member's address as it appears on the books of the Company, with postage thereon prepaid.

(c)      If all of the Members shall meet at any time and place, either within or outside of Oregon, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

(d)      At all meetings of the Members a Member may vote its Voting Interest in person or by a proxy executed in writing by the Member or by a duly authorized attorney-in-fact.  Such proxy shall be filed with the Manager before or at the time of the meeting and may be of any duration except that a Member who shall appear in person at a meeting shall void any outstanding proxy for so long as such Member is in attendance.

(e)      Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by Members sufficient to have approved the actions or resolutions at issue had a duly called meeting been held at which all Members were in attendance and delivered to the Manager for inclusion in the Company records.  Action taken under this Section is effective when the necessary Members have signed the consent, unless the consent specifies a different effective date.  The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

(f)      When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of such notice.

(g)      The Manager may permit any or all Members to participate in the meeting by, or may permit the conduct of the meeting through, use of any means of communication by which all Members participating may simultaneously hear each other.

12.      **Status of Members.**

12.1      <u>No Participation in Management</u>.  Except as specifically provided in Section 11, above, no Member shall take part in the conduct or control of the Company's business or the management of the Company, or have any right or authority to act for or on the behalf of, or otherwise bind, the Company (except a Member who may also be a Manager and then only in such Member's capacity as a Manager within the scope of the Manager's authority hereunder).

12.2      <u>Limitation of Liability</u>.  No Member shall have, solely by virtue of such Member's status as a Member in the Company, any personal liability whatever, whether to the Company, to any Members or to the creditors of the Company, for the debts or obligations of the Company or any of its losses beyond the amount committed by such Member to the capital of the Company, except as otherwise required by the Act.

12.3      <u>Death or Incapacity of Non-Manager Member</u>.  The death, incompetence, withdrawal, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which terminates the continued Membership of a Member in the Company, shall not cause a dissolution of the Company unless such Member is a Manager of the Company.  Upon the occurrence of such event, the rights of such non-Manager Member to share in the Net Income and Net Loss of the Company, to receive distributions from the Company and to assign an interest in the Company pursuant to Section 14.3 below shall, on the happening of such an event,

Page 12 – SECOND AMENDED AND RESTATED OPERATING AGREEMENT; Prestige Senior Living, L.L.C.

devolve upon such Member's executor, administrator, guardian, conservator, or other legal representative or successor, as the case may be, subject to the terms and conditions of this Agreement, and the Company shall continue as a limited liability company.  However, in any such event, such legal representative or successor, or any assignee of such legal representative or successor shall be admitted to the Company as a Member only in accordance with and pursuant to all the terms and conditions of Section 14.4 hereof.

12.4   <u>Death or Incapacity of a Manager Member</u>.   The death, incompetence, withdrawal, expulsion, bankruptcy or dissolution of a Member that is a manager, or the occurrence of any other event which terminates the continued Membership of such Member, shall cause a dissolution of the Company, unless the Company is continued in accordance with Section 16.1(e).  If the Company is continued in accordance with Section 16.1(e), unless the Interest of the Member is subject to purchase in accordance with Section 14.5, the rights of such Member to share in the Net Income and Net Loss of the Company, to receive distributions from the Company and to assign an interest in the Company pursuant to Section 14.3 hereof shall, on the happening of such an event, devolve upon such Member's executor, administrator, guardian, conservator, or other legal representative or successor, as the case may be, subject to the terms and conditions of this Agreement, and the Company shall continue as a limited liability company.  However, in any such event such legal representative or successor, or any assignee of such legal representative or successor shall be admitted to the Company as a Member only in accordance with and pursuant to all of the terms and conditions of Section 14.4 hereof.

12.5   <u>Recourse of Members</u>.   Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and such Member's Capital Contribution thereto and share of Net Income and Net Loss thereof and shall have no recourse therefor, upon dissolution or otherwise, against any Manager or any other Member.

12.6   <u>No Right to Property</u>.   No Member, regardless of the nature of such Member's contributions to the capital of the Company, shall have any right to demand or receive any distribution from the Company in any form other than cash, upon dissolution or otherwise.

13.   **Books and Records, Accounting, Reports and Statements and Tax Matters.**

13.1   <u>Books and Records</u>.   The Manager shall, at the expense of the Company, keep and maintain, or cause to be kept and maintained, the books and records of the Company on the same method of accounting as utilized for federal income tax purposes.

13.2   <u>Annual Accounting Period</u>.   All books and records of the Company shall be kept on the basis of an annual accounting period ending December 31 each year, except for the final accounting period which shall end on the date of termination of the Company.  All references herein to the "fiscal year of the Company" are to the annual accounting period described in the preceding sentence, whether the same shall consist of twelve months or less.

13.3   <u>Manager's Reports to Members</u>.   The Manager shall send at Company expense to each Member the following:

(a)   Within seventy-five (75) days after the end of each fiscal year of the Company, such information as shall be necessary for the preparation by such Member of such Member's

federal income tax return which shall include a computation of the distributions to such Member and the allocation to such Member of profits or losses, as the case may be; and

(b)      Within sixty (60) days after the end of each fiscal quarter of the Company, a quarterly report, which shall include:

(i)      A balance sheet;

(ii)     A statement of income and expenses;

(iii)    A statement of changes in Members' capital; and

(iv)    A statement of the balances in the Capital Accounts of the Members.

13.4    Right to Examine Records.   Members shall be entitled, upon written request directed to the Company, to review the records of the Company at all reasonable times and at the location where such records are kept by the Company.

13.5    Tax Matters Partner.   Should there be any controversy with the Internal Revenue Service or any other taxing authority involving the Company, the Manager may expend such funds as it deems necessary and advisable in the interest of the Company to resolve such controversy satisfactorily, including, without being limited thereto, attorneys' and accounting fees.  The Manager is hereby designated at the "Tax Matters Partner" as referred to in Section 6231(a)(7)(A) of the Code, and is specially authorized to exercise all of the rights and powers now or hereafter granted to the Tax Matters Partner under the Code.

Any cost incurred in the audit by any governmental authority of the income tax returns of a Members (as opposed to the Company) shall not be a Company expense.  The Manager agrees to consult with and keep the Members advised with respect to (i) any income tax audit of a Company income tax return, and (ii) any elections made by the Company for federal, state or local income tax purposes.

13.6    Tax Returns.   The Manager shall, at Company expense, cause the Company to prepare and file a United States Company Return of Income and all other tax returns required to be filed by the Company for each fiscal year of the Company.

13.7    Tax Elections.   The Manager shall be permitted in its discretion to determine whether the Company should make an election pursuant to Section 754 of the Code to adjust the basin of the assets of the Company.  Each of the Members shall, upon request, supply any information necessary to properly give effect to any such election In addition, the Manager, in to sole discretion, shall be authorized to cause the Company to make and revoke any other elections for federal income tax purposes as it deems appropriate, necessary, or advisable.

14.    **Transfers of Company Interests; Withdrawal and Admission of Members.**

14.1    General Prohibition.   No Member may voluntarily or involuntarily, directly or indirectly, sell, transfer, assign, pledge or otherwise dispose of, or mortgage, pledge, hypothecate or otherwise encumber, or permit or suffer any encumbrance of, all or any part of such Member's

interest in the Company, except as provided in this Section 14.  Any other purported sale, transfer, assignment, pledge or encumbrance shall be null and void and of no force or effect whatsoever.

14.2    <u>Withdrawal of Member</u>.  A Member shall have no power to withdraw voluntarily from the Company, except that a Member may withdraw upon written approval of a majority by Percentage Interest of the non-withdrawing Members, which approval shall include the terms for redemption by the Company of the Percentage Interest of such Member.

14.3    <u>Transfers by Members</u>.

(a)    Subject to any restriction on transferability required by law or contained elsewhere in this Agreement, a Member may transfer a portion or all of such Member's interest in the Company upon satisfaction of the following conditions:

(i)    The transfer shall (A) be by bequest or by operation of the laws of interstate succession, or (B) be approved in writing by the Manager; and

(ii)    The transferor and transferee shall have executed and acknowledged such reasonable and customary instruments as the Manager may deem necessary or desirable to effect such transfer; and

(iii)    The transfer does not violate any applicable law or governmental rule or regulation, including without limitation any federal or state securities laws.

(b)    At the time of a transfer of any Member's interest whether or not such transfer is made in accordance with this Section 14.3, all the rights possessed as Member in connection with the transferred interest, which rights otherwise would be held either by the transferor or the transferee, shall terminate against the Company unless the transferee is admitted to the Company as a Substitute Member pursuant to the provisions of Section 14.4 hereof; provided, however, that if the transfer is made in accordance with this Section 14.3. such transferee shall be entitled to receive distributions to which his transferor would otherwise be entitled from and after the effective date of such transfer, which date shall be specified by the Manager and shall be no later than the last day of the calendar month following the first calendar month during which the Manager has received notice of the transfer and all conditions precedent to such transfer provided for in this Agreement have been satisfied.  The Company and the Manager shall be entitled to treat the transferor as the recognized owner of such interests until such effective date and shall incur no liability for distributions made in good faith to the transferor prior to the effective date.

(c)    Notwithstanding any other provision of this Agreement, a Member may not transfer such Member's interest in any case if such a transfer, when aggregated with all other transfers within a twelve (12) month period, would cause the termination of the Company as a partnership for federal income tax purposes pursuant to Section 708 of the Code, unless such transfer has been previously approved by the Manager.

14.4    Admission of Transferees as Members.

(a)    No transferee of a Member shall be admitted as a Member unless all of the following conditions have been satisfied:

(i)    The transfer complies with Section 14.3;

(ii)    The further written consent of the Manager to such transferee being admitted as a Member is first obtained, which consent may be withheld;

(iii)    The prospective transferee has executed an instrument, in form and substance satisfactory to the Manager, accepting and agreeing to be bound by all the terms and conditions of this Agreement including the power of attorney set forth in Article 18 hereof, and has paid all expenses of the Company in effecting the transfer;

(iv)    All requirements of the Act regarding the admission of a transferee Member have been complied with by the transferee, the transferring Member and the Company; and

(v)    Such transfer is effected in compliance with all applicable state and federal securities laws.

(b)    In the event of a transfer complying with all the requirements of Section 14.3 hereof and the transferee being admitted as a Member pursuant to this Section 14.4, the Manager, for itself and for each Member pursuant to the Power of Attorney granted by each Member, shall execute an amendment to this Agreement and file any necessary amendments to the articles of organization for the Company.  Unless named in this Agreement, as amended from time to time, no person shall be considered a Member.

14.5    Expulsion of Members.  A Member may be expelled from the Company for breach of this Agreement upon (i) the affirmative vote of Members holding a majority of the Voting Interests or (ii) a final adjudication by a court of competent jurisdiction that such Member has breached this Agreement.  Upon expulsion, the Interest of the Member (the "Expelled Member") shall be repurchased by the Company on the following terms:

(a)    The Manager and the Expelled Member shall first seek to reach agreement upon a value for the interest of Expelled Member.  If they are unable to agree within 30 days, then at any time thereafter the Manager or the Expelled Member may give notice of election to value the interest of the Expelled Member pursuant to this Section 14.5.  Upon delivery or receipt of such notice, as applicable, the Manager shall designate an appraiser who shall establish within thirty (30) days thereafter the appraised fair market value of the Company's assets.  Goodwill of the Company, if any, shall not be considered in determining fair market value.  The cost of the appraisal shall be charged against any amounts payable to the Expelled Member hereunder.

(b)    The Company shall then purchase the Expelled Member's interest in the Company for the amount the Expelled Member would have received had the assets of the Company been sold for ninety percent (90%) of their appraised fair market value determined as provided in (a) above, the liabilities of the Company satisfied (without regard to prepayment

penalties unless triggered by a sale), Gain on Sale or Loss on Sale allocated in accordance with this Agreement, and the assets of the Company distributed in cash in liquidation.

(c)     The purchase shall close within ninety (90) days after the appraised fair market value is determined as provided in paragraph (a) above.  The Company shall pay ten percent (10%) of the applicable purchase price in cash at closing and the balance shall be represented by a nonrecourse promissory note, repayable at any time without penalty, secured solely by a pledge of the interest of the Expelled Member so purchased, and providing for annual payments of interest on the principal balance equal to eighty percent (80%) of the Prime Rate, as reported from time to time in the Money Rates section of the Wall Street Journal, with the principal balance due and owing in full upon the earlier of the dissolution of the Company or seven years from the date of closing.  At its option, the Company shall be entitled to offset any damages it has incurred as a result of the breach of this Agreement by the Expelled Member against any amounts owing to the Expelled Member for the purchase of such Expelled Member's Interest.

14.6     Abandonment by Member.   A Member may abandon its Membership and Membership Interest at any time by giving the remaining Members written notice of its abandonment.  Upon abandonment, the Interest of the Member (the "Abandoning Member") shall be redistributed among the remaining Members according to their percentage of Membership Interest immediately following the abandonment

## 15.   Resignation and Admission of Manager.

15.1     Resignation of Manager.  A Manager shall be entitled to resign as a Manager 120 days after delivery of written notice to the Company and the Members of the Manager's intention to resign, or upon such earlier date as the Manager's resignation is accepted by Members holding a majority of the Voting Interests in the Company.  Resignation of a Manager pursuant to this Section 15.1 shall not affect its interest as a Member of the Company. Notwithstanding the foregoing, the transfer of a Manager's Interest or reduction to its Percentage Interest below one percent (1%) shall constitute a resignation by such Manager which is effective at the time of such transfer.

15.2     Death or Incompetency of Manager.   A Manager shall cease to be a Manager upon the death, incompetence, bankruptcy or dissolution of such Manager, or any other event which terminates the continued Membership of the Manager as a Member of the Company.

15.3     Removal of Manager.   A Manager may be removed as a Manager upon the written approval of Members holding a majority of the Voting Interest of the Company. Removal of a Manager pursuant to this Section 15.3 shall not affect such Manager's interest as a Member of the Company.

15.4     Appointment of a New or Replacement Manager.  A new or replacement Manager may be appointed with the written approval of Members holding a majority of the Voting Interests of the Company.  No Manager may be appointed that is not a Member of the Company owning at least one percent (1%) Percentage Interest.

16.    **Dissolution, Winding Up and Termination.**

16.1    <u>Events Causing Dissolution</u>.  The Company shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of any of the following events:

(a)    Expiration of the term of the Company stated in Section 6 hereof;

(b)    Entry of a decree of administrative or judicial dissolution pursuant to the Act;

(c)    The sale or other disposition of all or substantially all of the assets of the Company;

(d)    The death, incompetence, withdrawal, expulsion, resignation or removal as a Manager or bankruptcy or dissolution of a Member which is the last remaining Member of the Company, unless (i) within 120 days of such occurrence, Members owning at least a majority of Percentage Interests in the Company, consent to the appointment of a new Managers) in accordance with Section 15.4, in which case the business of the Company shall be carried on by the newly appointed Managers), and (ii) the conditions of Section 16.1(e) are also satisfied;

(e)    The death, incompetence, withdrawal, expulsion, bankruptcy or dissolution of a Member who is a Manager, or any other event that terminates the continued Membership of such Member unless at the time of the occurrence of any of such events there are at least two other Members, and within 120 days of such occurrence, Members owning at least a majority of Percentage Interests in the Company, consent to the continuation of the Company, in which case the business of the Company shall be carried on by the remaining Managers); or

(f)    The vote of Members holding a majority of the Voting Interests of the Company to dissolve.

16.2    <u>Winding Up</u>.  Upon dissolution of the Company for any reason, the Manager shall commence to wind up the affairs of the Company and to liquidate its assets.  In the event the Company has terminated because the Company lacks a Manager, then the remaining Members shall appoint a new Manager solely for the purpose of winding up the affairs of the Company. The Manager shall have the full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation.  Pending such sales, the Manager shall have the right to continue to operate or otherwise deal with the assets of the Company.  A reasonable time shall be allowed for the orderly winding up of the business of the Company and the liquidation of its assets and the discharge of its liabilities to creditors so as to enable the Manager to minimize the normal losses attendant upon a liquidation, having due regard to the activity and condition of the relevant markets for the Company properties and general financial and economic conditions.  Any Member may be a purchaser of any properties of the Company upon liquidation of the Company's assets, including, without limitation, any liquidation conducted pursuant to a judicial dissolution or otherwise under judicial supervision; provided, however, that the purchase price and terms of sale are fair and reasonable to the Company.

16.3    <u>Allocation of Net Income and Net Loss Upon Termination or Sale</u>.  All Net Income and Net Loss upon dissolution of the Company or from sale, conversion, disposition or

Page 18 – SECOND AMENDED AND RESTATED OPERATING AGREEMENT; Prestige Senior Living, L.L.C.
017180.0075/6111163.2

taking of all or substantially all of the Company's property, including, but not limited to, the proceeds of any eminent domain proceeding or insurance award (respectively, "Gain on Sale" or "Loss on Sale") shall be allocated in accordance with the provisions of Sections 8.1 and 8.2.

In the event of a sale of all or substantially all of the Company assets where payment of a portion of the sales price is deferred and the Company uses the installment sale method to report such gain, the Capital Accounts of the Members shall be fully adjusted upon closing of the sale in accordance with Section 8.1 and 8.2 as though the full sales price had been received by the Company in cash at closing. Upon ultimate receipt of such deferred sales proceeds, gain shall be allocated among the Members in proportion to the amount of the excess, if any, of the gain credited to each Member's Capital Account at the time of the sale over the amount of gain recognized for federal income tax purposes at the time of such sale, but such allocation of gain upon receipt of proceeds shall not increase (again) the Members' Capital Accounts. Notwithstanding any other provision of this Agreement, interest income earned or accrued by the Company on an installment obligation subsequent to the closing of an installment sale shall be allocated among the Members in proportion to their relative positive Capital Account balances after adjustment of such accounts in accordance with this Section 16.3 and as such balances are reduced, from time to time, for cash distributions made by the Company to the Members.

16.4    <u>Distributions</u>.  Prior to making distributions in dissolution to the Members, the Manager shall first pay or make provision for all debts and liabilities of the Company and all expenses of liquidation. Subject to the right of the Manager to set up such cash reserves as it may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of liquidation and any other funds of the Company shall be distributed in the following order of priority:

(a)    First, to the Members in proportion to their remaining Capital Account balances as adjusted by the allocations provided for in Section 16.3;

(b)    Thereafter, the balance, if any, to the Members in proportion to their Percentage Interests.

It is intended and anticipated that the amount of cash distributable upon a termination or dissolution of the Company should equal the sum of the Members' Capital Accounts, after adjustment of such balances in accordance with Sections 8 and 16.3, and that therefore all cash will be distributable under Section 16.4(a).

16.5    <u>Certificate of Cancellation: Report: Termination</u>.  Upon the dissolution and commencement of winding up of the Company, the Manager shall execute and file articles of dissolution for the Company. Within a reasonable time following the completion of the liquidation of the Company's assets, the Manager shall prepare and furnish to each Member, at the expense of the Company, a statement which shall set forth the assets and liabilities of the Company as of the date of complete liquidation and the amount of each Member's distribution pursuant to Section 16.4 hereof. Upon completion of the liquidation and distribution of all Company funds, the Company shall terminate and the Manager shall have the authority to execute and file all documents required to effectuate the termination of the Company.

17.   **Special and Limited Power of Attorney.**

(a)    The Manager shall at all times during the existence of the Company have a special and limited power of attorney as the authority to act in the name and on the behalf of each Member to make, execute, swear to, verify, acknowledge and file the following documents and any other documents deemed by the Manager to be necessary for the business of the Company:

(i)    This Agreement, any separate articles of organization, fictitious business name statements, as well as any amendments to the foregoing which, under the laws of any state, are required to be filed or which the Manager deems it advisable to file;

(ii)    Any other instrument or document which may be required to be filed by the Company under the laws of any state or by a governmental agency, or which the Manager deems it advisable to file; and

(iii)    Any instrument or document which may be required to effect the continuation of the Company, the admission of a Manager or Member, the transfer of an interest in the Company, or the dissolution and termination of the Company (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement), or to reflect any increases or reductions in amount of contributions of Members.

(b)    The special and limited power of attorney granted to the Manager hereby:

(i)    Is a special and limited power of attorney coupled with an interest, is irrevocable, shall survive the dissolution or incompetency of the granting Member, and is limited to those matters herein set forth;

(ii)    May be exercised by the Manager for each Member by listing all of the Members executing any instrument with a single signature acting at attorney-in-fact for all of them;

(iii)    Shall survive a transfer by a Member of such Member's interest in the Company pursuant to Section 14.3 hereof for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument or document necessary or appropriate to admit a transferee as a Member, and

(iv)    Notwithstanding the foregoing, in the event that a Manager ceases to be a Manager in the Company, the power of attorney granted by this Section 17 shall terminate immediately with respect to such Manager.

18.   **Amendments.**  Except as otherwise provided by law, this Agreement may be amended in any respect by a majority vote of the Members voting by Percentage Interests; provided, however, that:

(a)    Without the consent of a majority in interest of the Members to be adversely affected by the amendment, this Agreement may not be amended so as to change their rights on their interest in Net Income, Net Loss or distributions;

(b)     Without the consent of each Member to be adversely affected by the amendment, this Agreement may not be amended so as to increase the liability of or change the capital contributions required by a Member; and

(c)     In the case of any provision hereof which requires the action, approval or consent of a specified Percentage Interest of Members, such provision may not be amended without the consent of the Members owning such specified Percentage Interest.

19.     **Miscellaneous.**

19.1    <u>Notices</u>.  Any notice, offer, consent of other communication required or permitted to be given or made hereunder shall be in writing and shall be deemed to have been sufficiently given or made when delivered personally to the party (or an officer of the party) whom the same is directed, or (except in the event of a mail strike) five days after being mailed by first class mail, postage prepaid, if to the Company or to a Manager, to the office described in Section 4 hereof, or if to a Member, to such Member's last known address.  Any Member may change such Member's address for the purpose of this Section 19.1 by giving notice of such change to the Company, such change to become effective on the tenth day after such notice is given.

19.2    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understandings among them, oral or written, all of which are hereby cancelled.  This Agreement may not be modified or amended other than pursuant to Section 18 hereof.

19.3    <u>Captions: Pronouns</u>.  The paragraph and section titles or captions contained in this Agreement are inserted only as a matter of convenience of reference.  Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provision hereof.  All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

19.4    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the same counterpart.

19.5   <u>Governing Law</u>.   This Agreement shall be governed by and construed i: accordance with the internal laws of the state of Oregon.

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first written above.

**Manager**

_____

Mr. Gregory J. Vislocky

**Members**

_____

Mr. Harold G. Delamarter


_____

Dr. Rick Delamarter


_____

Mr. Gregory J. Vislocky

19.5 <u>Governing Law</u>.  This Agreement shall be governed by and construed i: accordance with the internal laws of the state of Oregon.

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first written above.

**Manager**

_____

Mr. Gregory J. Vislocky

**Members**

_____

Mr. Harold G. Delamarter

_____

Dr. Rick Delamarter

_____

Mr. Gregory J. Vislocky

**AMENDMENT**
**TO**
**SECOND AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**PRESTIGE SENIOR LIVING, L.L.C.**

This Amendment to Second Amended and Restated Operating Agreement (the "Amendment") is made and entered into by the parties listed on the signature page (the "Members") who are all of the members of Prestige Senior Living, L.L.C., an Oregon limited liability company (the "Company") on the effective date of this Amendment.

## RECITALS

The then members of the Company entered into the Second Amended and Restated Operating Agreement of Prestige Senior Living, L.L.C., dated as of September 1, 2014, (the "Operating Agreement"). Since that date, one of the then members transferred his interests in the Company with the consent of the Company and the other Members and the transferees have been admitted as Members. The Members desire to amend the Operating Agreement to reflect the changes in membership and to make certain changes to the restrictions on transfer of membership interests.

## AMENDMENT

The Members agree to amend the Operating Agreement as follows:

1. The following definitions are added to in Section 1 of the Operating Agreement:

   1.1 "Control" of a Person means possession, directly or indirectly, of the power to direct the management and policies of that Person, whether through equity ownership, voting control, by contract or otherwise.

   1.2 "Person" means an individual, a trust or an entity.

2. Section 7.1 of the Operating Agreement is amended to read as follows:

   7.1 <u>Capital Contributions, Percentage Interests</u>. The Members or their predecessors in interest have contributed cash or property in exchange for their membership interest. The current Members and their Percentage Interests are:

   | Name | Percentage Interest |
   |---|---|
   | Harold G. Delamarter | 28.33% |
   | Brian Rick Delamarter, Trustee of the Delamarter Family Trust U/T/D 6/11/1993 | 27.78% |

|  |  |  |
|---|---|---|
| DEL-BLB LLC |  | 13.89% |
| Gregory J. Vislocky |  | <u>30.00%</u> |
|  | Total | 100.00% |

3.     Section 14.1 of the Operating Agreement is amended to read as follows:

14.1   <u>General Prohibition</u>.

(a)     No Member may voluntarily or involuntarily, directly or indirectly, sell, transfer, assign, pledge or otherwise dispose of, or mortgage, pledge, hypothecate or otherwise encumber, or permit or suffer any encumbrance of, all or any part of such Member's interest in the Company, except as provided in this Section 14.   Any other purported sale, transfer, assignment, pledge or encumbrance shall be null and void and of no force or effect whatsoever.

(b)     Any Member desiring to make any transfer of all or any part of the Member's interest in the Company must notify the Company not less than 45 days in advance of the intended effective date of the transfer.

(c)     For purposes of this Operating Agreement, any transaction which results in the following will constitute a transfer of the Member's interest in the Company under the terms of this Section 14, including, but not limited to, the approval requirements of Section 14.3 of this Operating Agreement:

(i)     Control of a Member being transferred to a Person other than Rick Delamarter, Harold G. Delamarter, Elizabeth A. Delamarter or Gregory J. Vislocky (each a "Controlling Party") or

(ii)     direct or indirect beneficial ownership of a Member's interest in the Company by a Person who is not a Controlling Party or a lineal descendant of a Controlling Party.  For purposes of this clause (b), a Member's interest held, directly or indirectly, by a Person as the trustee of a trust shall be deemed to be beneficially owned by the current beneficiaries of the trust.

4.     Except as specifically amended hereby, all terms, rights, responsibilities and obligations as set forth in the Operating Agreement remain in full force and effect.

5.     The Amendment may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one agreement, binding on all the parties hereto, notwithstanding that all of the parties are not signatory to the same counterpart.

The Members have executed this Second Amendment effective as of July 15, 2016.

**MEMBERS**:

_____
Harold G. Delamarter

_____
Gregory J. Vistocky

_____
Brian Rick Delamarter, Trustee of the
Delamarter Family U/T/D 6/11/1993

DEL-BLB LLC

By: _____
        Rick Delamarter, Manager

The Members have executed this Second Amendment effective as of July 15, 2016.

**MEMBERS**:

_____
Harold G. Delamarter

_____
Gregory J. Vislocky

_____
Brian Rick Delamarter, Trustee of the
Delamarter Family U/T/D 6/11/1993


DEL-BLB LLC

By: _____
          Rick Delamarter, Manager